Robert F. CAREY, an individual, and Norma Carey, an individual, Plaintiffs,

v.

SHILEY, INC., a California corporation; Pfizer, Inc., a Delaware corporation; and Grindley Manufacturing, Inc., a California corporation, Defendants.

Civil No. 4–97–CV–10182.

United States District Court, S.D. Iowa, Davenport Division.

Dec. 16, 1998.

Todd M. Boothroyd, Ronald M. Sotak, James A. Brewer, Newbrough Johnston Brewer & Maddux, Ames, IA, James T. Capretz, Richard J. Radcliffe, Capretz & Radcliffe, Newport Beach, CA, Terence R. Quinn, Quinn Eisland Day & Barker, Belle Fourche, SD, for Robert F. Carey and Norma Carey.

Robert D. Houghton, Shuttleworth & Ingersoll, Cedar Rapids, IA, Alan F. Goott, Steven J. Glickstein, Maris Veidemanis, Bert Slonim, Liza I. Karsai, Kaye Scholer Fierman Hays & Handler, New York City, for Shiley Inc., Pfizer Inc. and Grindley Mfg., Inc.

## ORDER

LONGSTAFF, District Judge.

The Court has before it several motions for summary judgment filed July 17, 1998, by defendants. Plaintiffs resisted the motions September 25, 1998, and defendants filed re-

ply briefs October 21, 1998. The motions are now considered fully submitted.[1]

## I. BACKGROUND

Plaintiffs Robert and Norma Carey filed the above-captioned lawsuit against defendants Shiley, Inc. ("Shiley"), Pfizer, Inc. ("Pfizer"), and Grindley Manufacturing, Inc. ("Grindley").[2] The Careys' claims stem from an artificial heart valve implant Robert Carey received in 1980. Physicians explanted the valve prosthesis in 1993. In an eight count complaint, plaintiffs allege negligence (Count I) against all three defendants, and the following against defendants Shiley and Pfizer: negligent misrepresentation (Count II); fraud and deceit (Count III); breach of express warranty (Count IV); breach of implied warranty (Count V); strict liability (Count VI); intentional infliction of emotional distress ("IIED") (Count VII); and loss of consortium (Count VIII).

### A. Factual Background

The facts set forth herein are either undisputed or viewed in a light most favorable to the nonmoving party. On May 5, 1980, plaintiff Robert Carey ("Mr.Carey") underwent surgery during which physicians replaced his mitral heart valve.[3] In place of the natural valve, the doctors implanted a Bjork–Shiley 60˚ Convexo–Concave artificial heart valve (the "CC valve"). At some point after plaintiff received the implant, it became apparent that the CC valve carried with it the risk of a mechanical failure known as "strut fracture." A strut fracture in a CC valve may result in death or serious injury to the person wearing the implant. In 1986, Shiley withdrew the CC valve from the United States market. Defendant estimates that more than 80,000 CC valves were implanted prior to the market withdrawal.

In February 1985, Mr. Carey's cardiologist, Dr. Lewis January, informed Mr. Carey that the CC valve carried with it a risk of strut fracture. Mr. Carey's subsequent cardiologist, Dr. Allyn Mark,[4] as well as other treating physicians, also discussed the strut fracture risk with him in the early 1990s. Dr. Mark did not recommend elective replacement of the CC valve. Mark Deposition, at 41–42.

Dr. Mark diagnosed Mr. Carey with aortic valvular disease in October 1993.[5] Mark Deposition, at 46–47. Dr. Mark considered Mr. Carey's condition serious enough to warrant aortic valve replacement. *Id.* After discussions and decision-making involving the Careys and various physicians, Mr. Carey underwent valve replacement surgery in December 1993. During the course of the surgery, Dr. Nicholas Rossi replaced Mr. Carey's natural aortic valve with an artificial valve. Additionally, Dr. Rossi removed the CC valve and replaced it with a new mitral valve prosthesis.

Mr. Carey suffered post-operative complications, which he alleges required him to undergo the following procedures: reopening of the surgical incision to cleanse an infection and insert tubes for antibiotic therapy; surgical removal of a chest tube which had become entangled in a chest wire; surgical removal of a chest wire that was protruding from Mr. Carey's chest; removal of a Pick tube that was clotting or leaking, followed by surgical insertion of a Hickman tube in Mr. Carey's shoulder to replace the Pick tube; and removal of the Hickman tube. Mr. Carey alleges additional complications arising from the December 1993 surgery: enterobacter mediastinitis, an infection in his sternal incision that extended to his chest, causing a

---

**1.** Although the parties requested oral argument, the Court finds a hearing unnecessary.

**2.** Shiley manufactured the valve, Pfizer is the sole shareholder and owner of Shiley, and Grindley is a component part manufacturer.

**3.** A human heart without defect contains four natural valves: the mitral valve, the aortic valve, the pulmonary valve, and the tricuspid valve. The mitral and aortic valves control blood flow into and out of the heart's two main pumping chambers. *See* Merck Research Laboratories,

*The Merck Manual of Medical Information–Home Edition* 93 (1997) [hereinafter *The Merck Manual* ].

**4.** Dr. January retired and Dr. Mark replaced Dr. January as Mr. Carey's cardiologist.

**5.** Physicians diagnosed Mr. Carey with aortic valve stenosis, "a narrowing of the aortic valve opening that increases resistance to blood flow from the left ventricle to the aorta." *The Merck Manual, supra* note 2, at 97.

sternal infection; sleep disorders and delusions; a blood stream infection; and atrial fibrillation, which "led his heart to be cardioverted back to sinus rhythm, only to again revert back to atrial fibrillation many months later." Plaintiff's Memo. of Law in Support of Opposition to Defendants' Mtn. for Summary Judgment (Causation), at 10.

Plaintiffs bring this action seeking damages resulting from problems related to the CC valve.

### B. Standard of Review

Summary judgment is properly granted when the record, viewed in the light most favorable to the nonmoving party, shows that there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Walsh v. United States*, 31 F.3d 696, 698 (8th Cir. 1994). The moving party must establish its right to judgment with such clarity that there is no room for controversy. *Jewson v. Mayo Clinic*, 691 F.2d 405, 408 (8th Cir. 1982). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (emphasis added). An issue is "genuine" if the evidence is sufficient to persuade a reasonable jury to return a verdict for the nonmoving party. *Id.* 477 U.S. at 248, 106 S.Ct. 2505. "As to materiality, the substantive law will identify which facts are material. . . . Factual disputes that are irrelevant or unnecessary will not be counted." *Id.*

### C. Defendants' Motions for Summary Judgment

Defendants seek summary judgment on several grounds, each filed in a separate

motion. In the interest of efficiency, the Court will consider the several motions for summary judgment in this single Order. Defendants seek summary judgment as to plaintiffs' express and implied warranty claims (Counts IV and V). Additionally, defendants seek summary judgment on all counts on the ground of lack of causation. Defendants also seek summary judgment on all counts arguing that plaintiffs' claims are pre-empted by federal law. Defendants seek partial summary judgment as to plaintiffs' claims for emotional distress damages which occurred prior to the replacement of Mr. Carey's heart valve, and for Count VII (intentional infliction of emotional distress). Finally, defendants seek partial summary judgment as to plaintiffs' defective manufacture claims (Counts I, IV, and VI).

### D. Breach of Express and Implied Warranty Claims

Defendants filed a motion for partial summary judgment as to plaintiff's breach of warranty claims (Counts IV and V). Plaintiffs filed a statement of non-opposition to this motion. Accordingly, summary judgment in favor of defendants and against plaintiffs is granted as to Counts IV and V.

## II. CAUSATION

Defendants argue that they are entitled to summary judgment because plaintiffs cannot establish a material issue of fact regarding causation, an element necessary to prove each claim.

### A. Negligence

■■■ "Causation is an element essential for finding a party liable in a tort action." *Iowa Elec. Light and Power Co. v. General Elec. Co.*, 352 N.W.2d 231, 234 (Iowa 1984). Under Iowa law, a negligence claim requires proof that the defendant's negligent actions proximately caused the plaintiff's injuries.[6]

---

**6.** The Iowa Supreme Court has explained that its use of the term "proximate cause" refers to both causation in fact and legal causation. *Hagen v. Texaco Refining and Marketing, Inc.*, 526 N.W.2d 531, 537 (Iowa 1995). The instant case is concerned with causation in fact. In *Gerst v. Marshall*, the Iowa Supreme Court examined some inconsistencies which had arisen in its cases defining and discussing causation. 549 N.W.2d 810, 815–17 (Iowa 1996). Although the court

acknowledged some doubts as to whether the substantial factor test is appropriately categorized as part of the causation in fact analysis, the court declined to decide whether the substantial factor test should be eliminated from the causation in fact analysis. *Id.* 549 N.W.2d at 817. Rather, the court reiterated that it had consistently required plaintiffs to satisfy the "but for" test of causation in fact, and that it had required

See *Banks v. Harley–Davidson, Inc.,* 73 F.3d 213, 215 (8th Cir.1996); *Spaur v. Owens–Corning Fiberglas Corp.,* 510 N.W.2d 854, 858 (Iowa 1994) (citation omitted). To establish proximate cause under Iowa law, a plaintiff must prove that the alleged defect was a "substantial factor" in producing the plaintiff's injuries, and that the injury would not have occurred "but for" the alleged defect.[7] *Banks,* 73 F.3d at 215; *Spaur,* 510 N.W.2d at 858 (citation omitted). "Substantial" means the defect had such an effect in producing the injury as to lead a reasonable person to regard it as the cause. Iowa Uniform Jury Instruction 700.3; *see also Benn v. Thomas,* 512 N.W.2d 537, 539–40 (Iowa 1994). Proximate cause is usually an issue for the jury under Iowa law; however, to survive a motion for summary judgment, a plaintiff must show a genuine fact dispute surrounding the issue. *Banks,* 73 F.3d at 215–16.

In arguing that plaintiffs' case lacks causation, defendants submit that Mr. Carey underwent surgery in 1993 to replace his diseased and failing aortic valve, and that the CC valve explant was incidental to the aortic implant. As a procedure incidental to the aortic implant, defendants argue that the CC valve replacement did not cause the injuries of which plaintiffs complain. Plaintiffs characterize the 1993 surgery differently, arguing that Mr. Carey consented to the aortic valve surgery only because it presented an opportunity to have the CC valve explanted. They argue that if the CC valve had not carried with it the risk of strut fracture, which could be alleviated by explanting the valve during open heart surgery, Mr. Carey would not have agreed to the open heart surgery and the accompanying aortic valve implant.

Supporting their opposition to summary judgment, plaintiffs present the following material facts: (1) testimony of Dr. Allyn Mark indicating that Mr. Carey's CC valve had thrombus or fibrin strains on it, and that surgery may have been necessary to replace the CC valve even if Mr. Carey did not have aortic valve disease; (2) testimony of Dr.

Nicholas Rossi regarding the wisdom of explanting the CC valve; (3) testimony by Dr. Rossi that the explant presented an aspect of additional risk to the 1993 open heart surgery; (4) testimony of plaintiffs' expert cardiac surgeon that if, hypothetically, Mr. Carey did not have aortic stenosis and was asymptomatic, he would have counseled him on the risks of strut fracture; (5) testimony of Norma Carey that "but for the explant of the CC valve, [Mr. Carey] may have elected to forego the aortic valve surgery." Plaintiffs' Statement of Material Facts (Causation Issue), at 3. The Court will examine each in turn.

1. Expert Testimony Regarding the Purpose of the 1993 Surgery

Dr. Allyn Mark, Mr. Carey's cardiologist, testified that clinical notes summarizing a transesophageal echo ("TEE") indicated fibrin strands were attached to the mitral valve prosthesis. Mark Deposition, at 44. The notes also indicated that the CC valve had thrombus. *Id.* Additionally, Dr. Mark testified that the aortic valve stenosis was a serious problem for Mr. Carey:

Q: So based on the TEE, was it your understanding that his aortic valvular disease had continued to progressively get worse?

A: It was certainly my understanding that it was a serious and the major clinical problem at that point, in addition to the recurrent atrial arrythmias.

Q: And at this time the CC valve appeared to have normal motion and appeared to be functioning regularly?

A: Correct.

Q: Now, at that time did you feel that it was necessary to replace or consider replacing Mr. Carey's natural aortic heart valve?

A: Correct.

---

the substantial factor test-in conjunction with the "but for" test-in the majority of cases. *Id.* 549 N.W.2d at 817.

7. Plaintiffs allege defendants failed to exercise reasonable care in all aspects of the research and

development, design, engineering, manufacture, inspection, testing, reworking, labeling and warning, advertising, merchandising and promotion, distribution and sale of the CC valve. *See* Complaint ¶¶ 16–18.

Q: Was his condition serious enough that you felt the surgery needed to be done fairly soon after his TEE?

A: Well, I am confident that I suggested that—*I would have suggested that he not postpone it for six months or a year.* I don't recall any indication that he had to have that done within hours or the next day or two, that this was something that should be done electively in the near future.

Q: It was only a matter of time, in other words, before his aortic valve disease would have progressively—

A: Correct. Once a patient develops symptomatic aortic stenosis particularly, the prognosis even for survival over the next several years is not good, and so I am *confident that we not only recommended but probably strongly recommended that he have aortic valve surgery.*

Q: Now, based on the TEE, did you also feel that it was appropriate or necessary to have the surgeon also examine the CC mitral valve to see whether there was a thrombus on the valve?

A: I am—I don't recall that specific conversation, but it certainly would have seemed appropriate.

Q: And if a thrombus was present, to replace the valve?

A: Probably.

Q: If a mechanical heart valve has a clot on it, is replacement the recommended treatment?

A: I would have said that had the clinical findings at the time of the TEE focused solely or found solely the atrial-fibrin strands here that are described, and only that, then *I am not certain that I would necessarily have recommended replacement of that valve for that reason.* Because it's likely that other valves might also have a risk of some thrombi, and coagulation might be an alternative option.

So I would probably have consulted with several of my colleagues about how we would have proceeded had the sole issue been the finding of the fibrin strands on the TEE.

Q: But as long as in this case you had the—you had in your view to replace the aortic valve, as long as Mr. Carey was undergoing the surgery, then it made sense to go in and work with the mitral valve?

A: Surely, Surely, even if the TEE had not found the fibrin strands, it would have made sense to inspect the mitral prosthesis.

\*   \*   \*   \*   \*   \*

Q: The results of the cardiac catheterization confirmed your previous—

A: Correct.

Q:—conclusion that the aortic valve should be replaced?

A: Correct.

Q: There was nothing in the cardiac catheterization report indicating that there was any dysfunction of the CC valve?

A: Correct.

\*   \*   \*   \*   \*   \*

Q: And it [the operative record] also indicates here that the CC valve was replaced because Mr. Carey desired to have it replaced?

A: Correct.

Mark Deposition, at 46–54 (emphasis added).

Plaintiffs also rely on testimony from Dr. Nicholas Rossi, Mr. Carey's cardiac surgeon. Dr. Rossi recognized that the CC valves carried with them an estimated fracture rate of .10 percent each year. Rossi Deposition, at 25. He also testified that he had conversations with Dr. Mark regarding whether the CC valve should be replaced. However, the deposition testimony indicates that these considerations were made only after the doctors realized that aortic valve replacement was warranted and that Carey would undergo open heart surgery to replace his aortic heart valve. Rossi Deposition, at 25–26, 28. Dr. Rossi stated:

Q: Do you recall whether any physician of Mr. Carey's recommended that the aortic valve be replaced and then you do an open evaluation of the CC valve?

A: Yeah, I was pretty much decided to replace it, unless there was some reason that came up during the procedure that would dissuade me. And actually, as I recall, the valve looked okay. I didn't see any clots or strands or anything on it, or anything wrong with its placement.

Q: So it's fair to say then that replacement of the CC valve was entirely incidental to replacement of the aortic valve?

A: Yeah, it was a separate consideration.

Q: The aortic valve was in quite bad shape at that time, correct?

A: Yeah, I think it was—it suffered changes to the degree that required replacement.

\* \* \* \* \* \*

Q: Am I correct in understanding that the decision to replace the CC valve was made once it was clear that the aortic valve had to be replaced?

A: Right. I mean if—you're placed in a tough situation. You are there, you have exposed the valve, and then having looked at it, you know, why would you have gone to all that problem. I think that if I weren't going to replace it—well, I think in this case I would have looked at it just to be sure there wasn't any thrombus on it or anything wrong with it because of all the anxiety that it was producing on his mind, but having done that and not seeing anything functionally wrong with the valve, we still replaced it, because it was Dr. Mark's opinion that it was worth the added risk for the benefit of the patient.

Q: To relieve the patient's anxiety?

A: Right.

Rossi Deposition, at 28–30.

The testimony of Drs. Mark and Rossi contradicts plaintiffs' claim that the CC valve was the substantial reason for the 1993 open heart surgery. Dr. Mark stated that his examinations indicated Mr. Carey's natural aortic valve needed timely replacement. Dr. Rossi indicated that the aortic valve replacement was the primary purpose of the surgery, and that the CC valve explant was incidental. The Court finds that these physicians' testimony presents no evidence from which a fact-finder could reasonably conclude that the CC valve explant was concomitant with, rather than incidental to, the aortic valve implant surgery.

The Iowa Supreme Court considered a comparable issue in *McCleeary v. Wirtz*, a medical malpractice action. 222 N.W.2d 409 (Iowa 1974). *McCleeary* was a suit against a physician and a hospital based on an allegedly negligent amputation of a woman's leg. The elderly woman had sustained severe injuries in a car accident, including bone fractures in both legs. Among other care, the treating physician placed both of the woman's legs in casts. Upon removal of the right leg cast, the physician observed that gangrene had developed. The treating physician consulted another doctor, and they agreed that the gangrenous condition resulted from a blockage of the woman's circulatory system. They concluded that amputation of the leg was necessary, and performed the surgery. The plaintiffs alleged that the doctor and hospital failed to provide adequate supervision, care, and treatment, which proximately caused the amputation of the woman's right leg.

The Iowa Supreme Court affirmed a directed verdict in favor of the defendants, because the plaintiffs failed to show proximate cause. Expert testimony indicated that the woman's frail health prevented the doctor from performing other treatments. Thus, the Iowa Supreme Court concluded: "In other words, had [the doctor] discovered the blockage earlier and promptly secured expert cardiovascular assistance, no different result would have obtained. *Since severance of Mrs. Longstaff's leg would have been necessary regardless of [the doctor's] conduct it must follow this conduct could not have been a substantial factor in bringing about the harm of which complaint is made.*" 222 N.W.2d at 415 (emphasis added).

*McCleeary* leads this Court to find Dr. Mark's testimony, or that of any other expert regarding the necessity of a CC valve explant absent the aortic implant, insufficient to raise fact issues in the instant case. Both Mr. Carey [8] and his physicians agreed that the aortic implant was necessary regardless of the need for the CC valve explant. The evidence submitted indicates that physicians performed the 1993 surgery for the purpose of implanting an aortic valve prosthesis in Mr. Carey. This Court finds that a reasonable fact-finder could not conclude otherwise.

8. The parties have submitted exhibits which confirm that Mr. Carey agreed to the procedure. These exhibits are discussed later in this Order. *See infra* Part II.A.2.

Plaintiffs suggest that expert testimony—specifically, that of Dr. Mark and plaintiffs' expert witness—creates an issue of fact because Mr. Carey would have needed CC valve replacement regardless of the aortic valve disease. This theory is purely speculative and is insufficient to create a triable issue of fact. The facts indicate that Mr. Carey did suffer from aortic valve disease, and this Court has already concluded that the aortic valve replacement was the primary purpose of the 1993 surgery. The Court finds plaintiffs' argument that Mr. Carey would have needed CC valve replacement regardless of the aortic valve disease immaterial to any causation issues in the instant case.

The Court finds the primary medical purpose of Mr. Carey's 1993 open heart surgery was the aortic valve implant, and concludes that plaintiffs have raised no triable issues of fact surrounding this issue.

### 2. Plaintiffs' Testimony Regarding the Purpose of the Surgery

Plaintiffs also present testimony of Norma Carey in support of their claim that a material fact exists as to causation. The Careys allege that issues of fact exist as to causation because Mr. Carey would not have agreed to surgery for the aortic valve implant absent the need for the CC valve replacement. Norma Carey testified:

> when Bob was being examined by Dr. Mark and they were recommending the aortic valve be replaced, we had a conversation between us talking about his quality of life and how the aortic valve was affecting his life, ... looking at facing that major surgery again and the complications that were possible, we were trying to decide if he was willing to go on in that manner without having that surgery done, having the aortic valve replaced, but our main thrust of having that done was to have the mitral valve removed, because we did not want to be under the cloud of having that valve there and the thought of it possibly fracturing, ... not knowing that it might the next day, so that's basically why we decided to go ahead and have the aortic valve replaced, was to have the other one explanted.

Norma Carey Deposition, at 36–37 (Plaintiff's Exhibit 4).

Although Mrs. Carey testified that the couple agreed to the aortic implant only because they viewed it as incidental to the mitral explant, Mr. Carey's actions suggest a contrary understanding. Prior to the 1993 surgery, Mr. Carey indicated that the CC valve explant was incidental to the aortic valve replacement. In a letter to Dr. Rossi, dated November 30, 1993, Mr. Carey stated:

> Since we will not have much time before surgery next week I would like to state again my feelings about the Bjork–Shiley valve. If it is possible, without a much greater risk, I would like it removed and replaced. The final decision is yours to make.
>
> If the valve is removed it should be handled with care by the pathologist. After living for thirteen years worrying whether it might break, I would like to have the valve returned to me for possible testing by a metallurgist.

Letter from Mr. Carey to Dr. Rossi (Defendants' Exhibit 23). This letter indicates that Mr. Carey requested the CC valve replacement only after he had agreed to and scheduled the aortic implant surgery. Additionally, he left the final decision regarding the replacement to his cardiac surgeon. At his deposition, Mr. Carey agreed that the letter was an accurate reflection of his feelings prior to the surgery:

> Q: When did you tell Dr. Mark that you wanted to have your Bjork–Shiley valve out, after he told you that you needed to have the surgery, was it that very same conversation?
>
> A: I would guess, yes, or shortly thereafter.
>
> Q: Was your reasoning, Mr. Carey, because you were going to have the surgery anyway, you were having open heart surgery, you might as well have the Bjork–Shiley valve removed?
>
> A: Yes.

Robert Carey Depo. (Defendants' Exhibit 29), at 60. The letter, as well as the sworn testimony of Mr. Carey, contradicts the de-

position testimony of Mrs. Carey, taken after the post-surgical complications developed.

"[A] party cannot avoid summary judgment by contradicting his own earlier testimony." *Prosser v. Ross,* 70 F.3d 1005, 1008 (8th Cir.1995) (citing *Wilson v. Westinghouse Elec. Corp.,* 838 F.2d 286, 289 (8th Cir.1988)). The Eighth Circuit has extended this principle to cases in which "a plaintiff attempts to avoid summary judgment by proffering testimony from another person that contradicts the plaintiff's own testimony." *Id.* This Court feels it appropriate to extend the principle enunciated in *Prosser* to this case, when a plaintiff has made sworn statements contradictory to those made by a co-plaintiff. Accordingly, the Court finds no triable issue of fact arising out of Mrs. Carey's testimony, which is both self-serving and contradicted by that of her husband.

### 3. Expert Testimony Regarding Additional Risks the Explant Presented

Plaintiffs also argue that their damages arose out of the additional risks associated with the 1993 open heart surgery, and that these risks arose from the mitral valve replacement. In support of this assertion, plaintiffs present Dr. Rossi's deposition testimony that the replacement of the mitral valve increased the risks associated with the surgery. Rossi Depo. 23–24, 26.

Plaintiffs present no evidence that the additional risks of the mitral valve explant were the cause of Mr. Carey's complications. To survive a motion for summary judgment, a party must submit specific facts showing that there is a genuine issue for trial, and these facts must be supported by more than a scintilla of evidence. *See Dush v. Appleton Elec. Co.,* 124 F.3d 957, 962–63 (8th Cir.1997). Dr. Rossi's comments that the mitral valve replacement may have increased the risks associated with the 1993 surgery are inconclusive and unsupported by additional evidence quantifying the risk or attributing the injury to the additional risk posed by the mitral valve replacement. This Court believes that plaintiffs' scintilla of evidence is insufficient to create a triable issue of fact as to whether the additional risks presented by the mitral valve replacement were the cause of Mr. Carey's post-operative complications.

Plaintiffs have failed to create an issue of fact suggesting that Mr. Carey's complications would not have occurred but for the CC valve replacement. Alternately, the Court also concludes plaintiffs have failed to raise a triable issue of fact suggesting that the mitral valve replacement was a substantial factor in the post-operative complications Mr. Carey suffered. Because plaintiffs have failed to demonstrate a triable issue of fact surrounding causation in fact—an element essential to the negligence claim (and all other tort claims)—this Court grants summary judgment in favor of defendants and against plaintiffs as to Count I.

### B. Negligent Misrepresentation

A negligent misrepresentation claim requires proof that the negligently supplied information was a proximate cause of the plaintiff's damage. *See Beeck v. Kapalis* 302 N.W.2d 90, 96–97 (Iowa 1981) (citing Restatement (Second) of Torts § 552 (1977)); *see also Larsen v. United Federal Savings & Loan Assn. of Des Moines,* 300 N.W.2d 281, 287 (Iowa 1981). This Court has already concluded that plaintiffs have failed to demonstrate an issue of fact surrounding the causation in fact element of plaintiffs' claims; therefore, the Court finds no triable issue of fact relating to the causation element of Count II and grants summary judgment in favor of defendants on this allegation.

### C. Fraud and Deceit

Plaintiffs' Count III alleges fraudulent misrepresentation. To establish such a claim under Iowa law, a plaintiff must prove that the representation was a proximate cause of the plaintiff's damage. *See Garren v. First Realty, Ltd.,* 481 N.W.2d 335, 338 (Iowa 1992). For the reasons set forth above, the Court finds no triable issue of fact relating to the causation element of Count III.

### D. Strict Liability

A product liability suit based on a strict liability theory of recovery requires proof that the defendant's action was the proximate cause of the damages suffered by the plaintiff. *See Franzen v. Deere & Co.,* 377 N.W.2d 660. 663 (Iowa 1985). For the rea-

sons set forth above, the Court finds no triable issue of fact relating to the causation element of Count VI.

### E. Intentional Infliction of Emotional Distress ("IIED")

An IIED claim requires the plaintiff to prove the defendant's outrageous conduct was a proximate cause of the emotional distress plaintiff experienced. *Vaughn v. Ag Processing, Inc.*, 459 N.W.2d 627, 635–36 (Iowa 1990). To the extent that Mr. Carey claims his emotional distress arises from the 1993 surgery, and for the foregoing reasons, the Court finds no triable issue of fact relating to the causation element of Count VII. Mr. Carey's claim of emotional distress resulting from his fear of strut fracture remains.

Mr. Carey concedes that he is not seeking damages for emotional distress he suffered prior to the explant of his CC valve. Plaintiff's Memo. of Law in Opposition to Defendants' Motion for Partial Summary Judgment (Emotional Distress), at 1–2. Plaintiffs' concession, coupled with this Court's determination regarding a lack of proof of causation for any emotional distress arising after the surgery, defeats all claims associated with Count VII. Therefore, summary judgment is granted on Count VII in favor of defendant and against plaintiff.

The aforementioned analysis also resolves defendants' Partial Motion for Summary Judgment (Emotional Distress); therefore, the Court will not revisit the motion later in this Order. The motion is granted in its entirety in favor of defendants and against plaintiffs, and finds it unnecessary to review any additional arguments the parties have presented regarding the issue.

### F. Loss of Consortium

■ Plaintiff Norma Carey's loss of consortium claim is dependent on proof that defendants committed tortious acts which caused injury to her husband. This Court has already concluded plaintiffs have failed to set forth evidence sufficient to create an issue of fact regarding the causation element of Mr. Carey's claims. Because Norma Carey's claim derives from Mr. Carey's underlying tort claim, the Court finds plaintiffs have failed to present a basis from which Mrs. Carey could claim loss of consortium damages.

Defendants' motion for summary judgment based on plaintiffs' failure to set forth sufficient proof of causation is granted in its entirety.

## III. FEDERAL PRE–EMPTION

In the alternative, defendants seek summary judgment on all counts, arguing that federal law pre-empts plaintiffs' state common law claims.

The Supremacy Clause provides that federal law may pre-empt state law in some instances. U.S. Const. art. VI, cl. 2. In analyzing a pre-emption issue, a court "[s]tart[s] with the assumption that the historic police powers of the States [are] not to be superseded by ... [a] Federal Act unless that [is] the clear and manifest purpose of Congress." *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 516, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992) (citations and internal quotation marks omitted). The ultimate touchstone in analyzing a pre-emption issue is congressional intent, which may be expressly stated or implied. *Id.* Congressional intent is primarily discerned "from the language of the pre-emption statute and the statutory framework surrounding it." *Medtronic v. Lohr*, 518 U.S. 470, 486, 116 S.Ct. 2240, 135 L.Ed.2d 700 (1996) (citations and internal quotation marks omitted). Also relevant is "the structure and purpose of the statute as a whole, as revealed not only in the text, but through the reviewing court's reasoned understanding of the way in which Congress intended the statute and its surrounding regulatory scheme to affect business, consumers, and the law." *Id.* (citations and internal quotations marks omitted).

### A. Federal Law

The 1976 Medical Device Amendments ("MDA") to the Food, Drug, and Cosmetic Act gave the Food and Drug Administration ("FDA") regulatory authority over medical devices. The MDA subjects medical devices to different classifications, based on the ease with which their safety and effectiveness may be assured. Heart valves, such as the CC valve at issue in the instant case, are considered Class III devices, which require FDA premarket approval ("PMA"). 21 U.S.C.

§ 360c; 21 U.S.C. § 360e(a); *see also Martello v. Ciba Vision Corp.*, 42 F.3d 1167, 1168 (8th Cir.1994).

To obtain FDA premarket approval for a Class III device, an application must be filed with the agency including information regarding:

(A) full reports of all information ... concerning investigations which have been made to show whether or not the device is safe and effective;

(B) a full statement of the components, ingredients, and properties and of the principle or principles of operation, of such device;

(C) a full description of the methods used in, and the facilities and controls used for, the manufacture, processing, and, when relevant, packing and installation of, such device;

(D) an identifying reference to any performance standard ... and either adequate information to show that such aspect of such device fully meets such performance standard or adequate information to justify any deviation from such standard;

(E) such samples of such device and of components thereof as the Secretary may reasonably require ...;

(F) specimens of the labeling proposed to be used for such device; and

(G) such other information relevant to the subject matter of the application as the Secretary ... may require.

21 U.S.C. § 360e(c)(1). After the manufacturer submits this information to the Secretary, a panel of experts reviews the information. 21 U.S.C. § 360e(c)(2). When the review process is complete, the Secretary may approve or deny the application. In making the decision, the Secretary must conclude that the applicant has provided a reasonable assurance of the safety and effectiveness of the device. 21 U.S.C. § 360e(d). If the Secretary approves the device, the manufacturer is subject to a continuing duty to maintain records for and make reports to the FDA regarding the safety of the device. The United States Supreme Court has described the PMA process as a "rigorous" one, and noted that the FDA spends an average of 1200 hours reviewing each device's application. *Medtronic*, 518 U.S. at 477, 116 S.Ct. 2240.

The MDA contains an express pre-emption provision, which provides in pertinent part:

(a) General Rule

Except as provided in subsection (b) of this section, no State or political subdivision of a State may establish or continue in effect with respect to a device intended for human use any requirement—

(1) which is different from, or in addition to, any requirement applicable under this chapter to the device, and

(2) which relates to the safety or effectiveness of the device or to any other matter included in a requirement applicable to the device under this chapter.

21 U.S.C. § 360k(a). The Eighth Circuit has interpreted the MDA to mean that a state tort claim is pre-empted by federal law if:

(1) the FDA has established regulations specific to the medical device in issue, (2) the state claim imposes a requirement different from, or in addition to, any FDA requirement for the device, and (3) the claim relates to the safety or effectiveness of the device, or to any other matter included in an MDA requirement for the device.

*Martello v. Ciba Vision Corp.*, 42 F.3d at 1168 (citation omitted).

**B. Regulations Specific to a Particular Medical Device**

The Eighth Circuit has determined that the premarket approval process is a specific requirement for a Class III medical device within the meaning of 21 U.S.C. § 360k(a) and 21 C.F.R. § 808.1(d).[9] *Martello*, 42 F.3d at 1169. This determination means that the

9. The regulation states, in pertinent part:

(d) State or local requirements are pre-empted only when the Food and Drug Administration has established specific counterpart regulations or there are other specific requirements applicable to a particular device under the act, thereby making any existing divergent State or local requirements applicable to the device different from, or in addition to, the specific Food and Drug Administration requirements. There are other State or local requirements that affect devices that are not pre-empted ... because they are not "requirements applicable to a device" within the meaning of ... the act. The following are examples of State or local requirements that are not regarded as pre-empted....

**1104**

first factor in the Eighth Circuit's MDA pre-emption analysis is satisfied, because the CC valve underwent the PMA process and obtained FDA approval. Plaintiffs challenge this conclusion, arguing that the United States Supreme Court's decision in *Medtronic v. Lohr* overruled the decision.

In *Medtronic*, the Supreme Court determined that the MDA did not pre-empt state common law tort claims against the Class III medical device at issue, a Model 4011 pacemaker manufactured by Medtronic. The manufacturer obtained expedited FDA approval for the device by using the "§ 510(k) process", which permits devices which are "substantially equivalent" to pre-existing devices a method of avoiding the rigorous premarket approval process. *See Medtronic*, 518 U.S. at 478, 116 S.Ct. 2240. Review for devices claiming substantial equivalence is completed in an average of 20 hours, in contrast to the 1200 usually spent on devices subject to premarket approval. *See Medtronic*, 518 U.S. at 478–79, 116 S.Ct. 2240.

In concluding that federal law did not pre-empt the state law claims at issue, the Supreme Court stressed that the § 510(k) process of expedited review was not a "requirement" within the meaning of the MDA. *Medtronic*, 518 U.S. at 493–94, 116 S.Ct. 2240; *see also* 21 U.S.C. § 360k(a). The Court noted:

Thus, even though the FDA may well examine § 510(k) applications for Class III

(1) ... requirements of general applicability where the purpose of the requirement relates either to other products in addition to devices (e.g., requirements such as general electrical codes, and the Uniform Commercial Code (warranty of fitness)), or to unfair trade practices in which the requirements are not limited to devices.
(2) ... requirements that are equal to, or substantially identical to, requirements imposed by or under the act.
21 C.F.R. § 808.1(d).

10. Since *Medtronic*, the Eighth Circuit has not revisited the issue of whether premarket approval is a specific requirement for a medical device, as defined in the MDA. However, other circuit courts of appeal and district courts have addressed similar issues regarding the MDA and pre-emption, concluding that FDA approval creates specific requirements that pre-empt different or additional state law requirements. *See, e.g., Mitchell v. Collagen Corp.*, 126 F.3d 902, 911 (7th Cir.1997) ("we believe that the PMA process con-

devices ... with a concern for the safety and effectiveness of the device ... it did not "require" Medtronics' pacemaker to take any particular form for any particular reason; the agency simply allowed the pacemaker, as a device substantially equivalent to one that existed before 1976, to be marketed without running the gauntlet of the PMA process.... Given this background behind the "substantial equivalence" exemption, the fact that "[t]he purpose of Congress is the ultimate touchstone" in every pre-emption case ... and the presumption against preemption, the Court of Appeals properly concluded that the "substantial equivalence" provision did not pre-empt the [plaintiffs'] design claims.

*Medtronic*, 518 U.S. at 493–94, 116 S.Ct. 2240 (internal citations omitted). *Medtronic* did not address the issue of whether the premarket approval process was a specific federal requirement which may pre-empt state law; rather, the decision focused on the § 510(k) process, which differs significantly from the PMA method. Consequently, this Court finds that *Martello*—concluding that the premarket approval process is a specific requirement under the MDA—and *Medtronic*—which did not address the premarket approval issue—are compatible. Reliance on *Martello* is appropriate and this Court finds no cause to disregard the Eighth Circuit law set forth in the decision.[10]

stitutes a specific federal regulation of the product"); *Papike v. Tambrands, Inc.*, 107 F.3d 737, 742 (9th Cir.1997) (noting that "pre-emption is triggered by and the scope of pre-emption is limited to instances where there are specific FDA requirements applicable to a particular device", and observing that *Medtronic* did not deal with device-specific federal requirements) (citation and internal quotation marks omitted); *Chambers v. Osteonics Corp.*, 109 F.3d 1243, 1247 (7th Cir.1997) ("the scope of pre-emption is limited to 'efforts by states to impose sanctions *for compliance with federal regulations* relating to the safety or efficacy of the product.") (emphasis added); *Martin v. Telectronics Pacing Sys., Inc.*, 105 F.3d 1090, 1097–98 (6th Cir.1997) (noting that federal law did not pre-empt state common law action in *Medtronic* because there were no specific federal requirements, but that pre-emption occurs when specific federal requirements exist); *see also Chmielewski v. Stryker Sales Corp.*, 966 F.Supp. 839, 842–44 (D.Minn.1997) (MDA pre-empted strict liability, negligent design, and failure to warn claims); *Easterling v. Cardiac Pacemakers,*

The FDA granted Shiley a PMA for the CC valve in 1979. Defendants' Exhibit A (Federal Pre-emption Exhibits). Accordingly, this Court concludes that the CC valve was subject to specific federal requirements imposed through the PMA process.

### C. State Law Requirements

Continuing the MDA pre-emption analysis, a court must also consider the nature of the state law requirements. Federal law will pre-empt the tort claims only if the requirements imposed by state law are different from or in addition to the specific federal requirements. *See Martello,* 42 F.3d at 1168; *see also Medtronic,* 518 U.S. at 500, 116 S.Ct. 2240. Additionally, the state law requirements must relate to safety and effectiveness of the device. *Id.* The Court will address each of plaintiffs' claims in turn.

### 1. Negligence and Strict Liability Claims

■ In *Martello,* the Eighth Circuit concluded that federal law pre-empted the plaintiffs' negligence and strict liability claims—requirements which the Eighth Circuit concluded "deal directly" with safety and effectiveness. *Martello,* 42 F.3d at 1169. In considering whether the state law requirements were different from or in addition to federal requirements, the court reasoned that during the PMA process, the FDA reviews a device's testing, design specifications, intended use, manufacturing method, performance standard, and labeling. *Martello,* 42 F.3d at 1169 (citation omitted). As discussed previously, a device's survival of the PMA process is a specific requirement under the MDA. *Id.* (citation omitted). Consequently, the Eighth Circuit concluded that the FDA had issued specific requirements regarding design, inspection, instructions, labeling, warning, and testing, and that any state law requirements stemming from the plaintiffs'

negligence or strict liability claims were different from or in addition to the federal requirements. *Id.* The court thus found federal law pre-empted the state law claims, concluding:

> [T]he MDA ... expressly pre-empts state tort claims involving the safety and effectiveness of Class III devices when the claims would impose additional requirements in areas regulated through the pre-market approval process.... Under this view, courts have held the MDA pre-empts state law claims of strict liability, breach of express and implied warranties, misrepresentation, failure to warn, and negligence in design, manufacturing, and labeling of Class III devices because the claims involve areas regulated through the pre-market approval process.

*Martello,* 42 F.3d at 1167 (citations omitted).

The Court finds little distinguishable difference between the claims at issue in the instant case and those analyzed in *Martello.* Similar to the device at issue in *Martello,* the FDA reviewed the CC valve through the PMA process and evaluated the safety and effectiveness of the valve. The FDA's review included the valve's design, the manufacturing process, and the instructions, warnings, and labeling of the valve. The state law claims of strict liability and negligence also relate to the safety and effectiveness of the device and would involve requirements in addition to those demanded by federal law. In fact, after the FDA approved the CC valve, Shiley could not have altered any aspect of the valve's manufacturing process, design, or labeling without violating federal law—even if such alterations were made for the purpose of complying with state law requirements. The Court therefore finds federal law pre-empts plaintiffs' negligence (Count I) and strict liability claims (Count VI).[11] Summary judgment is granted in fa-

---

*Inc.,* 986 F.Supp. 366, 373 (E.D.La.1997) (PMA process is a specific federal regulation under the MDA).

**11.** Plaintiffs argue that their claims are not pre-empted because defendants failed to comply with the federal requirements; therefore, the state requirements are the same as the federal requirements. The Court need not consider the substance of this argument because plaintiffs have presented no evidence that the valve at issue was

defective or failed to comply with federal regulations in any manner. The doctors and the metallurgist (hired by plaintiffs) who examined the valve indicated that it contained no flaws. Indeed, plaintiffs admit the valve at issue was *not defective. See* Plaintiffs Memo. of Law in Opposition to Def.'s Mtn. for Partial Summary Judgment as to Plaintiffs' Manufacturing Defect Claims, at 1 ("the record in this case contains no evidence that Mr. Carey's Shiley heart valve was defective....").

vor of defendants on these claims.

### 2. Negligent Misrepresentation and Fraud and Deceit

Initially, this Court finds that the state law claims of negligent misrepresentation and fraud are related to the safety and effectiveness of the device. The allegations set forth in the complaint unequivocally suggest plaintiffs' misrepresentation and fraud claims relate to the safety and effectiveness of the CC valve. *See* Complaint ¶¶ 22(a)–22(h) (averring negligent misrepresentation of the safety, effectiveness, and characteristics of the valve); ¶¶ 26(a)–26(h) (averring defendants fraudulently and deceitfully misrepresented the characteristics, safety, and effectiveness of the CC valve).

Nevertheless, the Court must consider whether these claims impose requirements different from or in addition to federal requirements. In the instant case, it appears plaintiffs present two lines of analysis to support their fraud and misrepresentation claims: defendants failed to comply with FDA requirements (the "noncompliance argument"), and defendants perpetrated fraud on the FDA, physicians, and the general public during and after the PMA process.[12]

#### a. Noncompliance

■■■ If a manufacturer violates the FDA's specific requirements regarding a medical device, then the MDA does not pre-empt state law claims, because the state requirements would be the same as or equal to the federal requirements. *See Medtronic,* 518 U.S. at 495, 116 S.Ct. 2240 ("the [plaintiffs'] allegations may include claims that [the

defendant] has, to the extent that they exist, violated FDA regulations.... without being pre-empted"); *see also Symens v. Smith-Kline Beecham Corp.,* 152 F.3d 1050, 1055 (8th Cir.1998) (concluding that "common law claims are not pre-empted for alleged violations of the federal substantive standards" which the United States Department of Agriculture issued regarding animal vaccines). Plaintiffs present several exhibits in support of their claim that defendants' lack of compliance with federal requirements extinguishes their ability to claim federal law pre-empts state law.

Although plaintiff has cited sources suggesting that defendants failed to comply with FDA requirements, there is no evidence of the defendants' noncompliance regarding Mr. Carey's CC valve. Mr. Carey's heart valve was not defective. The doctors and the metallurgist (hired by plaintiffs) who examined the valve indicated that it contained no flaws. Plaintiffs concede this point. *See* Plaintiffs Memo. of Law in Opposition to Def.'s Mtn. for Partial Summary Judgment as to Plaintiffs' Manufacturing Defect Claims, at 1 ("the record in this case contains no evidence that Mr. Carey's Shiley heart valve was defective...."). Because the parties agree that the record before this Court contains no evidence of any defects in Mr. Shiley's heart valve, plaintiffs cannot prove any allegation that defendants failed to comply with FDA regulations with regard to the valve at issue. This Court concludes that any evidence regarding Shiley's noncompliance with FDA regulations is irrelevant with respect to a heart valve without defect, since the noncompliance did not affect Mr. Carey's CC valve.[13]

---

12. Absent these arguments, plaintiffs' misrepresentation and fraud claims would be pre-empted. In *Mitchell v. Collagen Corp.,* the Seventh Circuit found similar claims pre-empted. 126 F.3d 902 (7th Cir.1997). Specifically, the court determined that the plaintiffs' mislabeling, misbranding, and adulteration claims were pre-empted because the PMA provided requirements for such activities as labeling and promotional activities. *Mitchell,* 126 F.3d at 913–14; *see also* 21 U.S.C. § 360e(d). The court also concluded that federal law pre-empted misrepresentation or fraud claims made under state law. *Id.* Even in the areas of advertising and promotional materials, pre-emption occurred because the PMA regulated these activities. *Id.* The court specified, however, that the claims were not pre-empted to

the extent that the defendant did not comply with the federal requirements. *Id.* Ultimately, the court found these claims could not survive summary judgment because the plaintiffs failed to present evidence sufficient to demonstrate a genuine issue of fact regarding the defendant's noncompliance with federal law. *Id.*

13. Plaintiffs suggest the fear of a defective heart valve drove Mr. Carey to seek replacement, and that the fact that the valve had no defects is irrelevant. The Court believes this argument is inappropriate to a fraud or misrepresentation cause of action in the instant case: the legal causation element necessary to prove such claims is tenuous, and this Court finds that it fails as a matter of law. *See supra* Part II.

*See Mitchell v. Collagen Corp.*, 126 F.3d 902, 913–14 (7th Cir.1997) (granting summary judgment in favor of defendants on fraud and misrepresentation allegations because plaintiffs failed to meet their burden in presenting evidence of noncompliance). Although plaintiffs' claim that defendants failed to comply with federal requirements is not pre-empted by federal law, plaintiffs have failed to submit any proof that defendants did not comply with federal requirements regarding Mr. Carey's CC valve.

### b.   Fraud

■   Plaintiffs' "fraud-on-the-FDA" theory requires the Court to consider whether the MDA pre-empts an action in which a private party claims damages for fraud or misrepresentations made to the FDA. The Third Circuit recently addressed the issue of whether a "fraud-on-the-FDA" theory may be maintained by a private plaintiff after a regulatory consultant to a medical device manufacturer allegedly perpetrated fraud during the § 510(k) process. *See In re Orthopedic Bone Screw Products Liability Litigation*, 159 F.3d 817, 821–29 (3rd Cir.1998) [hereinafter *"Bone Screw Litigation"*]. The court recognized that in light of *Medtronic*, federal law could not pre-empt the state law action, because the § 510(k) process did not create specific federal requirements for the device. *Id.* 159 F.3d at 823–25. The Third Circuit interpreted *Medtronic* as inferring that Congress' failure to create a federal remedy for violations of the Food, Drug and Cosmetic Act ("FDCA") was evidence of Congress' intent not to pre-empt common law liability for such violations. *Id.* 159 F.3d at 825. *But see Michael v. Shiley*, 46 F.3d 1316, 1328–29 (3rd Cir.1995) ("... plaintiffs may not bring implied causes of action for violations of the [FDCA]."). The court based this conclusion on the Supreme Court's statement in *Medtronic*:

> Under Medtronic's view of the statute, Congress effectively precluded state courts from affording state consumers any protection from injuries resulting from a defective medical device. Moreover, because

there is no explicit private cause of action against manufacturers contained in the MDA, and no suggestion that the Act created an implied private right of action, Congress would have barred most, if not all, relief for persons injured by defective medical devices. Medtronic's construction of § 360(k) would therefore have the perverse effect of granting complete immunity from design defect liability to an entire industry that, in the judgment of Congress, needed more stringent regulation in order "to provide for the safety and effectiveness of medical devices intended for human use," 90 Stat. 539 (preamble to Act). It is, to say the least, "difficult to believe that Congress would, without comment, remove all means of judicial recourse for those injured by illegal conduct," [citation omitted] and it would take language much plainer than the text of § 360k to convince us that Congress intended that result.

*Bone Screw Litigation*, 159 F.3d 817, 825 (citing *Medtronic v. Lohr*, 518 U.S. at 487, 116 S.Ct. 2240) (internal quotations omitted). The aforementioned language from *Medtronic* led the Third Circuit to conclude that Congress did not intend to pre-empt common law liability for violations of the FDCA. The court also reiterated the *Medtronic* conclusion that: "Congress did not intend to prevent a state from providing 'a traditional damages remedy for violations of common-law duties when those duties parallel federal requirements.'" *Bone Screw Litigation*, 159 F.3d 817, 825 (citing *Medtronic v. Lohr*, 518 U.S. at 495, 116 S.Ct. 2240). This reasoning led the court to conclude the plaintiff's fraudulent misrepresentation claim was not preempted by federal law.

Although the Third Circuit did not, in the above analysis, discuss or recognize any differences between the § 510(k) process and the PMA process,[14] this Court believes such a distinction is necessary. The PMA process, being more "rigorous" than the § 510(k) process, relies on the FDA's competence and oversight to guarantee the market-

---

**14.** In fact, the court overruled *Michael v. Shiley, Inc.*, 46 F.3d 1316 (3rd Cir.1995), a case involving CC valves, in which the Third Circuit had concluded that a "fraud on the FDA" theory was

pre-empted by federal law. *Michael*, 46 F.3d at 1328–30; *see also Bone Screw Litigation*, 159 F.3d 817, 825, n. 5.

ing and sale of safe Class III medical devices. Any allegation that a medical device survived the PMA process and obtained FDA approval through "fraud-on-the-FDA" would require a fact-finder to question both the FDA's competence and the agency's procedures in approving the device's application. This Court does not believe Congress intended, in enacting the MDA, to permit a private cause of action challenging the substance of the FDA's PMA process, or the FDA's expertise. A cause of action alleging the FDA failed to discern problems with a device during the rigorous PMA process in essence alleges problems with the approval process, and the Court believes Congress intended this mechanism to be policed by the FDA, not private parties. Assuming for the sake of argument that the FDA failed to discern the alleged fraud during the PMA process for Shiley's CC valve, then the FDA is the appropriate entity to perform an investigation and impose sanctions if necessary. Indeed, the dissenting opinion in *Bone Screw Litigation* reasoned similarly:

> In sum, where juries are permitted to displace the FDA's judgment about whether a manufacturer has engaged in improper marketing, they will fail to provide a consistent standard, inhibit valuable exchange of information on off-label uses, and needlessly raise the price of drugs and medical devices. It seems very unlikely that Congress intended a state cause of action to intrude so much both in the enforcement of the FDCA's regulatory scheme and in the severity of the penalties attached to a violation.
> · I most respectfully, but vehemently, dissent.

*Bone Screw Litigation,* 159 F.3d 817, 831–32 (Cowen, J., dissenting).

For all of the foregoing reasons, the Court believes that permitting a "fraud-on-the-FDA" cause of action by private parties would impose state law requirements different from or in addition to those imposed by federal law. Although *Bone Screw Litigation* came to a different conclusion, the Court believes that the case is distinguishable because the device gained approval through the § 510(k) process—a method of approval the Supreme Court, in *Medtronic,* recognized *does not* impose specific federal requirements

on a medical device. Accordingly, this Court finds plaintiffs' "fraud-on-the-FDA" theory of recovery pre-empted by federal law.

### c. Summary

The Court finds plaintiffs' noncompliance argument unsupported by evidence sufficient to survive summary judgment. Additionally, the Court finds plaintiff's fraud-on-the-FDA allegations pre-empted by federal law. Accordingly, the Court grants summary judgment in favor of defendants on Counts II (negligent misrepresentation) and III (fraud and deceit) because federal law pre-empts the state law claims. Defendants make no pre-emption arguments regarding the remaining claims (IIED and loss of consortium), and the Court will therefore not address whether these claims are pre-empted by federal law.

### IV. CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment as to Counts VI and V is GRANTED because the plaintiffs do not oppose the motion. Defendants' motion for summary judgment on the ground of lack of causation is GRANTED. Additionally, defendants' motion for summary judgment on the ground of federal pre-emption is GRANTED. Defendants' motion for partial summary judgment as to plaintiffs' emotional distress claims is GRANTED in its entirety. The Court declines to review the remaining motion for summary judgment (manufacturing defect) in the instant case, as the Courts' rulings on the other motions renders further review unnecessary. The Clerk of Court is directed to enter judgment for the defendants and against plaintiffs.

IT IS ORDERED.