**Flossie Beverley McCLEEARY, Executor of the Estate of Flossie L. Longstaff, and Flossie Beverley McCleeary, Executor of the Estate of John Longstaff, Appellants,**

v.

**Dwight C. WIRTZ, M.D. and Iowa Lutheran Hospital, Appellees.**

No. 2–56321.

Supreme Court of Iowa.

Oct. 16, 1974.

furnished Mrs. Longstaff. Upon the death of both aforesaid plaintiffs the executors of their respective estates, although one and the same party, became substitute plaintiffs. They appeal from judgments on directed verdicts for defendants on plaintiffs' action and from like relief for defendant hospital on its counterclaim. We affirm.

August 18, 1969, Mrs. Longstaff, then 78, was injured as the result of a car-truck collision. She suffered severe external lacerations, internal fracture of the left patella, the right tibia, tibial plateau, knee and clavicle.

Upon admission to hospital the patient was first attended and treated by Dr. Wirtz, an orthopedic surgeon, for the lacerations. At that time defendant doctor determined no further treatment should be administered because the patient was in a state of shock.

Stewart, Wimer, Brennan & Joyce by Joseph B. Joyce, Des Moines, for appellants.

Bradshaw, Fowler, Procter & Fairgrave by Kent M. Forney, Des Moines, for appellee Dwight C. Wirtz, M.D.

Patterson, Lorentzen, Duffield, Timmons, Irish & Becker by James A. Lorentzen, Des Moines, for appellee Iowa Lutheran Hospital.

Heard before MOORE, C. J., and RAWLINGS, LeGRAND, UHLENHOPP, and HARRIS, JJ.

RAWLINGS, Justice.

By action at law plaintiffs, John Longstaff and Flossie Longstaff, husband and wife, sought damages resulting from alleged negligence by defendants, Dr. Dwight C. Wirtz and Iowa Lutheran Hospital in Des Moines. Defendant hospital counterclaimed for value of services and supplies

August 20 Dr. Wirtz undertook a correction of the bone fractures, specifically the right collarbone, left knee and right leg. In this process the right leg was manipulated into an emendatory position without incision. Casts were then applied to both legs. By reason of the patient's pre-existing arthritic and poor circulatory condition the feet were not encased.

September 18 the left leg cast was removed per schedule. October 1, upon removal of the right leg cast, gangrene was found to have developed in that limb. Dr. Wirtz thereupon solicited the assistance of Dr. Alexander Matthews, a specialist in thoracic and cardiovascular surgery. Following an October 2 examination by Dr. Matthews and his conference with Dr. Wirtz, it was agreed the gangrenous condition, emanating from a blockage of the circulatory system, necessitated amputation of the right limb. October 3 this surgery was performed.

In brief, action against defendants doctor and hospital is based upon alleged failure to effect proper supervision, care and treatment, and failure to keep adequate records,

which proximately resulted in the amputation of Mrs. Longstaff's right leg.

At close of plaintiffs' evidence trial court sustained a motion for directed verdicts interposed by both defendants. Apparently attendant judgments were not then entered, nor was any motion voiced by hospital as to its counterclaim.

There followed an ineffective appeal by plaintiffs, with cross-appeal by hospital. Hospital then moved for correction and modification of the record regarding its counterclaim. Plaintiffs filed resistance thereto.

Subsequently, upon hospital's application for correction and modification of the record, trial court entered judgment on directed verdicts for both defendants as to plaintiffs' actions, with like relief to hospital on the counterclaim. Plaintiffs again gave notice of appeal, this time from all judgments entered.

In support of a reversal the executors-plaintiffs assert trial court erred in (1) directing a verdict for defendants on plaintiffs' actions, and (2) in directing a verdict for defendant hospital on its counterclaim.

The propriety of directed verdicts for defendants will be considered separately as to Dr. Wirtz and hospital. Also the directed verdict for hospital on its counterclaim will be independently reviewed.

I. First entertained is plaintiffs' assignment regarding entry of a directed verdict for Dr. Wirtz.

In this regard it is inceptionally urged, the patient's right leg was so negligently encased as to obstruct circulation of the blood, proximately resulting in the amputation. This necessitates a prefatory determination regarding the nature of evidence essential to establish a jury question.

On that subject we have held substantial evidence of negligence must be adduced in order to create a fact issue. By the same token a mere scintilla of evidence will not suffice. Absent the necessary showing, it is error to submit an issue to a jury. See

generally Wenndt v. Latare, 200 N.W.2d 862, 870 (Iowa 1972); Dobson v. Jewell, 189 N.W.2d 547, 553 (Iowa 1971); Ellingson v. Kramer, 255 Iowa 1257, 1262, 125 N.W.2d 777 (1964).

Furthermore, evidence regarding requisite skill and care exercised by a physician must ordinarily be given by experts. There are, however, exceptions to this rule when (1) the physician's lack of care is so obvious as to be within the comprehension of a layman's common knowledge or experience, or (2) the physician harms a part of the body not under treatment. See Wiles v. Myerly, 210 N.W.2d 619, 629 (Iowa 1973). But those exceptions are inapplicable to the case at hand. See Sinkey v. Surgical Associates, 186 N.W.2d 658, 660–662 (Iowa 1971).

■ Turning now to the record it reveals plaintiffs produced not one iota of evidence disclosing the cast affixed to patient's right leg was so tight it obstructed blood circulation. Moreover, no expert evidence was presented disclosing the techniques or procedures employed by Dr. Wirtz in affixing the cast were other than those customarily employed by physicians under like circumstances. See Grosjean v. Spencer, 258 Iowa 685, 691–692, 140 N.W.2d 139 (1966); cf. Johnson v. Van Werden, 255 Iowa 1285, 1290, 125 N.W.2d 782 (1964).

We are satisfied no substantial evidence of negligence was presented by plaintiffs in support of the instant assignment.

II. Next considered is plaintiffs' claim to the effect trial court further erred in directing a verdict for Dr. Wirtz because a jury issue had been generated as to his (1) failure to timely discover the circulatory blockage, and (2) failure, upon discovery thereof, to effect immediate corrective action or procure prompt vascular-surgical advice and assistance for that purpose. Since these issues are interrelated they will be accordingly reviewed.

Without resolving the matter of negligence regarding the foregoing issues, trial court found a fatal absence of adequate evidence as to proximate cause.

We last dealt with that subject in Winter v. Honeggers' & Co., Inc., 215 N.W.2d 316, 320 (Iowa 1974) and there said: " 'The actor's negligent conduct is a legal cause of harm to another if (a) his conduct is a substantial factor in bringing about the harm, and (b) there is no rule of law relieving the actor from liability because of the manner in which his negligence has resulted in the harm.' "

It must be prefatorily conceded proximate cause, like negligence, is usually a jury issue. See Iowa R.Civ.P. 344(f)(10).

Here, however, causal connection is essentially a matter which must be foundationed upon expert evidence. See Cronin v. Hagan, 221 N.W.2d 748 (Iowa 1974); Barnes v. Bovenmyer, 255 Iowa 220, 228–229, 122 N.W.2d 312 (1963); Bradshaw v. Iowa Methodist Hospital, 251 Iowa 375, 382–383, 101 N.W.2d 167 (1960).

More specifically, common knowledge and everyday experience would not suffice to permit a layman's expression of opinion as to whether Dr. Wirtz' failure to timely discover the circulatory blockage, or upon discovery thereof to promptly effect a circulatory correction or secure other expert advice and assistance for such purpose, was a substantial factor in bringing about the complained of result.

Passing over the matter of negligence by Dr. Wirtz in any respect above set forth, the question posed is whether plaintiffs presented essential expert testimony disclosing Dr. Wirtz' conduct was a proximate cause of the right leg excision.

Susan Scharnweber, a registered nurse and hospital employee, testified that a September 28, 1969, record entry by her stated, in part: "Femoral pulse felt strong and full in left leg at 100 beats per minute. Could not be counted in right leg as was very weak and thready. Right foot very cold while left foot is warm. All toenails on right foot blue but second toe the darkest." Miss Scharnweber also related a record entry made September 29, 1969, by a student nurse reading in part: "Turned two times before noon; toes and bottom of feet appeared purplish."

Dr. Wirtz was another plaintiff called witness. His testimony reveals, as aforesaid, he first saw Mrs. Longstaff August 18, 1969, when he treated her external lacerations. The morning of September 28, 1969, defendant doctor noted in the patient's progress report: " * * * patient has a cold right foot, left was warm, find no pulse in the right groin. * * * She does have a pulse in the left, that means the left groin." His next entry, made October 1, was: "Cast removed from the right leg, there is motion at the site of fracture, patient has developed a gangrene on the right leg with demarcation * * * about three inches above the knee joint, patient should have amputation of the leg but the general condition is not good."

Dr. Wirtz further testified the aorta runs from the heart to the abdomen ultimately branching off into the thighs, and he had examined the right groin area for pulse but found none. When asked the significance of this finding defendant doctor stated it would indicate a blockage of the aorta somewhere in the abdominal area resulting in a circulatory problem in the right leg. This blockage was attributed to Mrs. Longstaff's arteriosclerosis affliction.

Dr. Wirtz also testimonially stated, with regard to his September 28 record entry, he continued to observe the foot for signs of demarcation which denote the point at which gangrene localizes. In this regard, gangrene may focus in the foot necessitating amputation of only that part of the body. Dr. Wirtz' observation of the foot continued through September 29 and 30. When the cast was removed October 1, Dr. Wirtz discovered the previously mentioned demarcation above the knee.

As to any surgical procedure available by which to remedy the aforesaid circulatory blockage, defendant doctor stated that because of the patient's existing heart condition she "would have never tolerated any type of artery surgery * * * she would

have died on the table." The record discloses Mrs. Longstaff had suffered two heart ailments, one in early September, the other September 24. Additionally, her general condition had been failing since the latter part of August.

Dr. Matthews was also a plaintiff called witness. On direct examination this expert testified he had been asked by Dr. Wirtz to examine Mrs. Longstaff. Such examination was effected October 2 and the leg was amputated October 3.

The record also reveals this hypothetical question put to Dr. Matthews and his answer thereto:

"Q. * * * Assuming that the physician * * * Dr. Wirtz in this case, on September the 28th had noted as is contained in his progress record that he found no pulse in the right groin but does have a pulse in the left. And then assuming the situation as you found it at the time of your amputation, that is that there was no bleeding when you amputated this leg. Do you have an opinion doctor, based upon that which you saw at the time of your surgery, the pathologist's report, your examination and treatment of this lady, with respect to whether or not there was a blockage in her artery leading into the leg, and if so, where you believe that blockage to have existed? A. On the basis of what I saw both clinically before surgery and during surgery and also documented by the pathologist's report, this lady had severe generalized arteriosclerosis. This is a disease of the arteries that harden the arteries and then eventually occludes many of them * * *. The amount of disease in the arteries that I transected when performing the high amputation of this limb were such that the channel through which the blood comes to the extremity had been completely occluded not by fresh clot at the level of the amputation but by extensive hardening and occlusive disease of the arteries. The limb was dead and it was dead because it was not being profused by blood."

Dr. Matthews further testified, in substance, there are ordinarily two alternative surgical procedures available by which to attempt the correction of such a circulatory blockage: (1) open the abdominal area and directly attack the occluded artery (major vascular surgery), or (2) pull an inflated balloon, attached to a catheter, through the affected artery (minor vascular surgery).

When questioned as to whether, in light of the patient's existing heart condition, he would have undertaken any such vascular surgery September 27 or 28, the witness replied. "With this information available to me I would not intervene surgically * * * because I would infer that I would jeopardize her life in order to save a limb, if I could save a limb."

This expert further testified: "I would not have operated this lady even if I had seen her earlier because of the fact that she had sustained a major myocardial infarction and I would have placed her life in jeopardy in an effort to do something to her limb."

Another question put to Dr. Matthews was whether any treatment could have been effectively administered prior to the amputation. The answer was that either major or minor vascular surgery would have been too risky; the only available remedy was the amputation which he had recommended.

■ Even when the evidence is viewed in a light most favorable to plaintiffs it is apparent they failed to establish the necessary causal relationship between any alleged acts of negligence by Dr. Writz and the amputation of which complaint is made.

In this vein plaintiffs supplied no testimony, expert or otherwise, disclosing timely discovery of the blockage, instantaneous treatment, or prompt procurement of expert cardiovascular advice and assistance would, could or even might have obviated the ultimate surgery undertaken. See Winter v. Honeggers' & Co., Inc., 215 N.W.2d at 323. In fact, plaintiffs' only expert wit-

nesses, Doctors Wirtz and Matthews, unequivocally stated no other course of treatment was available or advisable under the circumstances. In other words, had Dr. Wirtz discovered the blockage earlier and promptly secured expert cardiovascular assistance, no different result would have obtained.

Since severance of Mrs. Longstaff's leg would have been necessary regardless of Dr. Wirtz' conduct it must follow this conduct could not have been a substantial factor in bringing about the harm of which complaint is made. See Restatement, Second, Torts, § 432(1) and comment (1)b.

Trial court correctly found absence of proximate cause precluded plaintiffs' right to recover damages from Dr. Wirtz.

III. Plaintiffs also assert trial court erred in sustaining the motion for a directed verdict on their action against hospital.

In that regard plaintiffs contend hospital and its agents were negligent in failing to (1) keep proper, careful, complete and dated records as to nurses' notes and observations, and (2) give notice thereof to Mrs. Longstaff or her husband.

Again, trial court found proximate cause had not been shown.

Cited in support of the stand taken by plaintiffs are Kastler v. Iowa Methodist Hospital, 193 N.W.2d 98 (Iowa 1971) and Dickinson v. Mailliard, 175 N.W.2d 588 (Iowa 1970). These cases are informative and we adhere to the views therein expressed, but find they do not resolve the problem here presented.

In brief, plaintiffs' cause of action against hospital encounters the same obstacle discussed in Division II above, i. e., absence of proximate cause.

■ Actually, plaintiffs do not so much as suggest how the alleged improperly-kept hospital records were a substantial causative factor in bringing about the result of which complaint is here made. In brief, there is not an iota of evidence, expert or otherwise, from which to conclude hospital's alleged negligence was a proximate cause of the controverted amputation. Trial court correctly so held.

■ Looking now to the above asserted negligence by hospital in failing to advise Mrs. Longstaff or her husband regarding the patient's condition, plaintiffs neither present argument on that issue nor is reference made to any authority touching on the subject. Therefore the assignment is deemed waived. See Kelly v. Iowa-Illinois Gas & Electric Company, 183 N.W.2d 720, 723 (Iowa 1971); Dickinson v. Mailliard, 175 N.W.2d at 597; Wilkes v. Iowa State Highway Commission, 172 N.W.2d 790, 798 (Iowa 1969); Quint-Cities Petroleum Co. v. Maas, 259 Iowa 122, 126, 143 N.W.2d 345, 347 (1966); Iowa R.Civ.P. 344(a)(2), (3), (4).

IV. Another issue to be resolved is whether trial court erred by directing a verdict adverse to plaintiffs on hospital's counterclaim and in entering attendant judgment for the value of services and supplies furnished Mrs. Longstaff.

In essence, plaintiffs here claim (1) trial court had no jurisdiction to so do; (2) hospital did not timely move for a directed verdict on the counterclaim; (3) such relief could not be effectively invoked by an application to correct the record; and (4) hospital's counterclaim was barred by the statute of limitations. These contentions will be considered in the order presented.

■ Ordinarily when notice of appeal is given, trial court's jurisdiction terminates. See Bass v. Iowa Public Service Company, 184 N.W.2d 691, 692 (Iowa 1971); State v. Olson, 259 Iowa 756, 762–763, 145 N.W.2d 645 (1966). But see Iowa R.Civ.P. 342(e).

At this point some repetition is essential. The record discloses directed verdicts were ordered March 8, 1973, for both defendants on plaintiffs' action. But no attendant judgments were then entered. Furthermore, absent any motion by hospital, its counterclaim against plaintiffs was left in

limbo. April 6, 1973, plaintiffs gave notice of appeal. Thereafter hospital filed the above noted application for correction and modification of the record to which plaintiffs interposed objection. The matter then came on for hearing after which trial court entered judgments on the directed verdicts for both defendants as to plaintiffs' actions, and for hospital on the counterclaim. Plaintiffs then gave a second notice of appeal.

As a preface to further discussion we find the first aforesaid appeal notice was premature, thus ineffective. Consequently trial court was not thereby divested of jurisdiction. See Lunday v. Vogelmann, 213 N.W.2d 904, 906 (Iowa 1973); Goecke v. Schoel, 257 Iowa 504, 507, 132 N.W.2d 481 (1965); Wilson v. Corbin, 241 Iowa 226, 228–229, 40 N.W.2d 472 (1950); Iowa R.Civ.P. 331, 332, 335.

Apparently hospital's failure to move for a directed verdict on the counterclaim in course of trial, prompted it to file the aforesaid application for correction and modification of the record by which rule 340(e) was specifically invoked.

Plaintiffs contend, however, and we agree, the cited rule allows nothing more than *correction* of a record already made, not the *making* of an additional record.

As stated in Wernet v. Jurgensen, 241 Iowa 833, 836, 43 N.W.2d 194, 196 (1950): "R.C.P. 341(a) [now rule 340(e)] deals with the correction of the record rather than the changing of the record." From this it would ordinarily follow, trial court had no authority to belatedly enter a directed verdict and related judgment for hospital on its counterclaim against plaintiffs under the guise of correcting the record.

On the other hand, we are here confronted with this unusual situation: (1) no in-course-of-trial directed verdict motion was voiced by claimant hospital; (2) an inoperative notice of appeal was given by plaintiffs; (3) absent a motion to reopen the case for further proceedings on the counter-claim, hospital made application for correction and modification of the trial record; (4) hospital belatedly moved for a directed verdict on the counterclaim; (5) trial court sustained said motion and entered attendant judgment against plaintiffs.

In light of the foregoing we would ordinarily reverse and remand for further appropriate proceedings. Under existing circumstances, however, such procedure would undoubtedly produce the same result as before at cost of needless delay, waste of energy, and unnecessary expense to the litigants.

Therefore, confining ourselves to the existent peculiar situation we elect to treat hospital's application for correction and modification of the record, upon which hearing was had, as a motion to reopen the case for further proceedings on the previously mentioned counterclaim.

V. Proceeding on that premise it appears the stand taken by plaintiffs in opposition to hospital's judgment is that its action stood barred by the statute of limitations.

But as stated in Pride v. Peterson, 173 N.W.2d 549, 554 (Iowa 1970); " * * * the bar of limitations is primarily an affirmative defense to be specially asserted in a separate division of the responsive pleading to the claim for relief." See also Earl v. Clark, 219 N.W.2d 487, 491 (Iowa 1974); Matney v. Currier, 203 N.W.2d 589, 592 (Iowa 1973).

Mindful thereof we have unsuccessfully searched the record in an effort to find any effective trial court pleading of such an affirmative defense. Surely a mere reference to the statute of limitations during oral argument to the court on some issue or motion does not so qualify.

From this flows the conclusion plaintiffs are here, for the first time, attempting to assert an affirmative defense. Therefore the instant contention will not be entertained. See In Re Marriage of Tuck-

er, 213 N.W.2d 498, 500 (Iowa 1973); Wiles v. Myerly, 210 N.W.2d at 624; Thomas Truck & Cast. Co. v. Buffalo Cast. & Wh. Corp., 210 N.W.2d 532, 535 (Iowa 1973).

Since authenticity and reasonableness of hospital's claim is conceded the judgment entered on a directed verdict for hospital against plaintiffs must stand.

VI. In their written brief plaintiffs here engage in a random discussion of their trial difficulty in presenting a hypothetical question to Dr. Matthews. No useful purpose will be served by elaborating upon this matter. It is not assigned as an issue, no argument is advanced with regard thereto, and not one authority is cited in support of the speculative position taken. Therefore the subject will not be considered. See authorities last cited in Division III, *supra.*

Affirmed.