**IN THE COURT OF APPEALS OF IOWA**

No. 15-1539
Filed March 8, 2017

**IN RE DETENTION OF**
**KEITH ADAMS,**
      Respondent-Appellant.

_____

      Appeal from the Iowa District Court for Scott County, Thomas G. Reidel,

Judge.


      Respondent appeals his civil commitment as a sexually violent predator.

**AFFIRMED.**


      Jason A. Dunn, Assistant Public Defender, for appellant.

      Thomas J. Miller, Attorney General, and Kelli A. Huser, Assistant Attorney

General, for appellee State.


      Heard by Mullins, P.J., and Bower and McDonald, JJ.

**MCDONALD, Judge.**

Respondent Keith Adams has been convicted of indecent exposure eleven times. Six of his eleven victims were between the ages of nine and thirteen. In 2014, the State initiated civil commitment proceedings pursuant to Iowa Code Chapter 229A (2014). A jury found Adams to be a sexually violent predator (SVP) within the meaning of the code, and the district court issued an order of commitment. Adams raises three challenges to his commitment in this appeal.

I.

Adams contends the district court should have granted his motion for mistrial made after the State's expert witness, Dr. Anna Salter, purportedly testified regarding the civil-commitment-screening process in violation of *In re Detention of Stenzel*, 827 N.W.2d 690, 708 (Iowa 2013). "A mistrial is appropriate when an impartial verdict cannot be reached or the verdict would have to be reversed on appeal due to an obvious procedural error in the trial." *State v. Newell*, 710 N.W.2d 6, 32 (Iowa 2006) (quotations marks and citation omitted). The refusal to grant a mistrial is reviewed for an abuse of discretion. *See State v. Gathercole*, 877 N.W.2d 421, 427 (Iowa 2016). "An abuse of discretion appears only when it was 'exercised on grounds or for reasons clearly untenable or to an extent clearly unreasonable.'" *State v. Anderson*, 448 N.W.2d 32, 33 (Iowa 1989) (quoting *State v. Ruble*, 372 N.W.2d 216, 218 (Iowa 1985)). This court grants the district court "broad discretion in determining whether to grant a mistrial" in "recognition of the trial court's better position to appraise the

situation in the context of the full trial." *Eldridge v. Casey's Gen. Stores, Inc.*, 533 N.W.2d 569, 571 (Iowa Ct. App. 1995).

In *Stenzel*, the State's expert witness testified in great detail regarding the rigorous commitment screening process. *See Stenzel*, 827 N.W.2d at 694–95, 704. The expert testified a review committee, a multidisciplinary team, the attorney general's office, and then a psychological expert each reviews the file before a determination is made to seek commitment pursuant to chapter 229A. *See id.* at 704. The clear import of the expert's testimony was any case that actually went to trial involved an offender determined to be an SVP on multiple occasions by multiple people and the jury should reach the same conclusion. *See id.* The prosecutor emphasized this point during closing argument. *See id.* at 705 ("The State's counsel argued to the jury that there is 'a screening process that goes into this and it's pretty sensitive and not many people meet the criteria as a sexually violent predator.' After recapping that screening process, counsel concluded, 'In this case, at every step of the way, Mr. Stenzel has been considered to meet criteria for SVP, but what's really—what's important is what do you think?'"). The *Stenzel* court concluded the expert's testimony should not have been allowed. *See id.* at 705–06. The court stated, "[i]ntroducing evidence that a lengthy selection process, including representatives inside and outside the department of corrections, picked out Stenzel to be one of the few candidates for SVP status presents a 'real danger the jury will be unfairly influenced' by a purportedly unbiased 'imprimatur.'" *Id.* at 707 (citation omitted). The risk of undue prejudice was great because the jury had a natural tendency to look to authority figures to guide them toward a decision and because the State

highlighted the expert's testimony. *See id.* The court held, "the introduction of such unfairly prejudicial information to the jury requires a new trial." *Id.* at 708. In *Stenzel*, a limiting instruction was not enough because "the State clearly sought to drive home the point that Stenzel was one of a few sex offenders that the State had selected," by soliciting the testimony then emphasizing it in its closing argument. *Id.*

Here, Adams successfully moved in limine to preclude Dr. Salter from testifying regarding the commitment screening process. Adams contends the State nonetheless elicited testimony regarding the same. On direct examination, the prosecutor asked Dr. Salter whether there "[a]re . . . cases that [Salter has] evaluated and found that a person does not meet Iowa's criteria for civil commitment." Adams objected, contending this question was "close to the edge," but the court overruled the objection. Salter then answered, "Yes. I actually say no more than I say," but was then cut off by Adam's renewed objection, which the court sustained. The district court ordered the jury to disregard the statement. The following exchange then occurred:

> Q: In the cases that you say no, you don't then testify correct? A: Right, so I don't then testify. There's no trial –
> Q: All right. A: -- if I say no, typically.

Adams' counsel again interjected and moved for mistrial, arguing this testimony violated *Stenzel* and the motion in limine. The court disagreed and denied the motion.

The district court did not abuse its discretion in denying the motion for mistrial. As is apparent from the quoted testimony, this case is readily distinguishable from *Stenzel*. The challenged testimony in this case is different in

kind from the challenged testimony in *Stenzel*. Here, Dr. Salter did not discuss at all the civil commitment screening process. *See id.* at 704. Dr. Salter did not discuss whether or how the screening process influenced her own conclusions. *See id.* She did not put an imprimatur on the prior determinations made before trial. *See id.* at 707. In addition, unlike the testimony in *Stenzel*, Dr. Salter's testimony had independent relevance. Dr. Salter first testified she concludes more often than not that an offender does not meet the criteria for classification as an SVP. The testimony goes towards Dr. Salter's objectivity. The testimony prebuts any contention Dr. Salter is a hired gun willing to testify to anything the State asks. Similarly, the second challenged piece of testimony—that Dr. Salter does not testify in cases where she has concluded the offender does not meet the criteria for classification as a sexually violent predator—also establishes credibility. It also is unsurprising. The State would not call an expert witness who does not support the State's case.

Even if Dr. Salter's testimony could somehow be construed to be improper in light of *Stenzel*, Adams was not entitled to any relief. There was no prejudice here. Dr. Salter's testimony is different in degree from the expert's testimony in *Stenzel*. *See id.* at 704–08. Dr. Salter did not testify about the lengthy screening and review process that occurred prior to trial. She did not highlight the expertise of the persons involved in the screening process. Further, unlike in *Stenzel*, the State did not highlight Dr. Salter's testimony or in any other way seek to "drive home the point" with the jury. *Id.* at 708. Her statements did not rob the jury of the ability or duty to independently evaluate the evidence presented and fairly

decide whether Adams was an SVP under the law, as was the court's concern in *Stenzel. See id.* at 706–08.

It was not unreasonable for the district court to determine neither of Salter's statements was so prejudicial as to warrant a mistrial. Therefore, the district court did not abuse its discretion when it denied Adams' motion for mistrial.

II.

Adams argues the district court abused its discretion in denying another motion for mistrial. On direct examination, Dr. Salter testified she had diagnosed Adams as having exhibitionist disorder, pedophilia, and other personality disorder, all of which are identified disorders in the Diagnostic and Statistical Manual of Mental Disorders (DSM-V). Dr. Salter testified she diagnosed Adams as having other personality disorder rather than anti-social personality disorder because she was unable to determine whether Adams had demonstrated conduct disorder prior to the age of fifteen—a necessary criterion for the diagnosis of anti-social personality disorder—due to her lack of access to Adams' juvenile records. Dr. Salter testified Adams did demonstrate predominant features of anti-social personality disorder, however. She testified Adams met six of the criteria associated with anti-social personality disorder: (1) "failure to conform to social norms with respect to lawful behaviors as indicated by repeatedly performing acts that are grounds for arrest"; (2) "impulsivity or failure to plan ahead"; (3) "irritability and aggressiveness as indicated by repeated physical fights or assaults"; (4) "[r]eckless disregard for the safety of self or others"; (5) lack of remorse; and (6) deceitfulness. Only three criterion need be

satisfied to support the diagnosis. Dr. Salter's original report had not disclosed any opinion regarding the criterion for deceitfulness. Dr. Salter testified she had updated her opinion regarding deceitfulness between the time of her report and the time of trial based on new information received from Adams' therapist. It is admitted the State failed to disclose the change in Dr. Salter's report or expected testimony prior to trial.

Adams objected to Dr. Salter's testimony regarding the deceitfulness criterion and moved for mistrial based on the State's failure to update Dr. Salter's report and disclose the change prior to trial. The district court denied the motion for mistrial but excluded evidence of deceitfulness and instructed the jury to disregard Salter's statements regarding that criterion. Adams contends the denial of his motion for mistrial constitutes prejudicial error.

We conclude Adams waived argument on this point. Adams cites no authority in support of his argument. *See* Iowa R. App. P. 6.903(2)(g)(3) ("Failure to cite authority in support of an issue may be deemed waiver of that issue."). More important, Adams merely sets forth a recitation of the relevant procedural facts without actually making an argument. This is insufficient to raise an issue for appellate review. *See Baker v. City of Iowa City*, 750 N.W.2d 93, 103 (Iowa 2008) (holding a plaintiff waived its argument by failing to support its conclusory contentions with any legal authority); *State v. Streit*, 80 N.W.2d 318, 319 (Iowa 1957) (refusing to review an assignment of error where "not one citation of authority is given [to the court] upon which defendant bases his propositions of error. This is inexcusable"); *In re Det. of West*, No. 11-1545, 2013 WL 988815, at *3 (Iowa Ct. App. Mar. 13, 2013) ("We do not consider conclusory statements

not supported by legal argument."); *see also United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991) (per curiam) ("Judges are not like pigs, hunting for truffles buried in briefs."); *State v. Piper*, 663 N.W.2d 894, 913–14 (Iowa 2003) (holding the defendant waived his claims where the issues were presented to the court on appeal as one-sentence conclusions lacking any analysis), *overruled on other grounds by State v. Hanes*, 790 N.W.2d 545, 551 (Iowa 2010); *McCleeary v. Wirtz*, 222 N.W.2d 409, 417 (Iowa 1974) (holding "subject [would] not be considered" where the plaintiff engaged only in a "random discussion of their trial difficulty" and failed to assign an issue, advance an argument, or cite authority "in support of the speculative position taken").

III.

Adams contends there was insufficient evidence in support of the jury's verdict. Our review is for the correction of errors at law. *See Easton v. Howard*, 751 N.W.2d 1, 5 (Iowa 2008). We will affirm where the verdict is supported by substantial evidence. *See In re Det. of Altman*, 723 N.W.2d 181, 184 (Iowa 2006). Substantial evidence exists "when a reasonable mind would accept it as adequate to reach a conclusion." *Johnson v. Dodgen*, 451 N.W.2d 168, 171 (Iowa 1990). The court views "the evidence in the light most favorable to the nonmoving party and take[s] into consideration all reasonable inferences that could be fairly made by the jury." *Easton*, 751 N.W.2d at 5.

The State was required to prove Adams was an SVP. *See* Iowa Code § 229A.7(5)(a) ("At trial, the court or jury shall determine whether, beyond a reasonable doubt, the respondent is a sexually violent predator."). An SVP is defined as "a person who has been convicted of or charged with a sexually

violent offense and who suffers from a mental abnormality which makes the person likely to engage in predatory acts constituting sexually violent offenses, if not confined in a secured facility." Iowa Code § 229A.2(12). A mental abnormality here means "a congenital or acquired condition affecting the emotional or volitional capacity of a person and predisposing that person to commit sexually violent offenses to a degree which would constitute a menace to the health and safety of others." Iowa Code § 229A.2(6); *see In re Det. of Barnes*, 658 N.W.2d 98, 101 (Iowa 2003) (clarifying mental abnormality requires "a showing of a serious difficulty controlling behavior"); *State v. Shannon S.*, 980 N.E.2d 510, 513–14 (N.Y. 2012) (holding proving mental abnormality does not "require that a diagnosis be limited to mental disorders enumerated within the DSM" to meet the statutory requirement). Under section 229A.2(5), a respondent is considered "likely to engage in predatory acts of sexual violence" when "the person more likely than not will engage in acts of a sexually violent nature."

Dr. Salter opined Adams was an SVP within the meaning of the statute. Dr. Salter testified Adams suffered from several mental abnormalities: exhibitionist disorder, pedophilia, and other personality disorder. She testified these disorders would make him likely to reoffend. In reaching that conclusion, Dr. Salter relied in part on actuarial models, including the Static 99-R and 2002-R. The Static 99-R revealed an offender with Adams' profile would have a 42.8% chance of being caught reoffending in the first ten years after release. The 2002-R revealed an offender with Adams' profile had a 41.2% chance of being caught reoffending within the first five years after release. Dr. Salter also relied upon dynamic factors, including treatment options available to Adams and his progress

through therapy. Dr. Salter opined Adams was in denial and lacked an adequate plan to prevent reoffending. In sum, the actuarial data when combined with the exacerbating dynamic factors supported Dr. Salter's conclusion Adams would more likely than not engage in acts of a sexually violent nature upon release.

Adams contends the verdict is not supported by substantial evidence as a matter of law because the actuarial models did not establish he would be more likely than not to reoffend because the models did not show a greater-than-fifty-percent likelihood he would reoffend. But Adams' contention disregards the nature of the tests. Dr. Salter testified the actuarial models predicted only the likelihood Adams would be caught and not the likelihood of reoffending. The likelihood an offender would be caught reoffending is less than the likelihood of reoffending, standing alone. *See In re Det. of Shearer*, No. No. 05-0048, 2006 WL 130705, at *4 (Iowa Ct. App. Jan. 19, 2006) (finding the district court did not abuse its discretion in finding there was sufficient evidence where the individual being committed was determined to have a less than fifty percent chance of being caught reoffending under the actuarial models but the State's expert testified the actuarial models "underestimate the likelihood of re-offense because they are based only on convictions and there are more sex offenses than there are convictions"). Adams' argument regarding the actuarial model also ignores the dynamic factors Dr. Salter considered in developing her opinion.

Adams also contends Dr. Salter's opinion was not reliable because she failed to consider Adams' physical health. In 2010, Adams was diagnosed with lung and brain cancer. He underwent treatment and his cancer went into remission. Adams presented medical testimony at trial that his cancer would

likely return and he was unlikely to live more than five years. In Adams' view, Dr. Salter's actuarial models are inapplicable to him because his life expectancy is less than the time period modeled. Dr. Salter was aware of Adams' condition and took the same into account, stating dynamic factors she considered included whether the individual would live or not.

Adams' argument is also unpersuasive for an additional reason. The testimony shows Adams' medical condition was a contributing factor to Adams reoffending. Adams testified he began reoffending because he was depressed about his cancer and because his treatment and medication affected his mood, judgment, and decision-making skills. Adams' medical expert was unable to opine, one way or another, whether the effects of Adams' medication were permanent. Adams does not know if the treatment and medication he would receive in the future would have the same or similar side effects. From this testimony, one can infer Adams' medical condition is actually an exacerbating factor rather than a mitigating factor.

In the end, the opinions of competing expert witnesses were presented to the jury. When dealing with expert witnesses, jurors are allowed to believe or disbelieve any or all of an expert witness's testimony. *See Burton v. Theobold*, 216 N.W.2d 299, 301 (Iowa 1974). When viewed in the light most favorable to the jury's verdict, there was substantial evidence in support of the jury's verdict.

IV.

We affirm the judgment of the district court.

**AFFIRMED.**