# IN THE COURT OF APPEALS OF IOWA

No. 17-1213
Filed January 9, 2019


**KASSIE RENE VEZEAU-CROUCH, Individually, as Daughter and Administrator of the ESTATE OF TONI ANNETTE VEZEAU,**
 Plaintiff-Appellee,

**vs.**

**ROY ABRAHAM, M.D. and MILLER ORTHOPEDIC,**
 Defendants-Appellants,

**and**

**ALEGENT HEALTH SYSTEMS, d/b/a CHI HEALTH and d/b/a MERCY HOSPITAL; JIANT PROPERTIES, LLC; ANTHONY AND JILL MISCISKIA,**
 Defendants.
_____


 Appeal from the Iowa District Court for Pottawattamie County, Jeffrey L. Larson, Judge.


 Dr. Roy Abraham and Miller Orthopedic interlocutory appeal from denial of their motion for summary judgment. **AFFIRMED.**


 Kellen B. Bubach and Frederick T. Harris of The Finley Law Firm, PC, Des Moines, for appellants.

 J. Joseph Narmi and Kristina M. Kaeding, Council Bluffs, for appellee.


 Heard by Potterfield, P.J., Doyle, J., and Danilson, S.J.*

 *Senior judge assigned by order pursuant to Iowa Code section 602.9206 (2019).

**DANILSON, Senior Judge.**

Roy Abraham, M.D., and Miller Orthopedic (collectively, "defendants") were granted interlocutory appeal from the district court's denial of their motion for summary judgment. Although there are four specifications of negligence in the petition, this appeal involves only one of them. Specifically, the defendants sought interlocutory relief on the issue of whether Dr. Henry Hull was qualified to testify regarding "Dr. Abraham's diagnosis and treatment of post-operative methicillin-resistant straphylococcus aureus (MRSA)." Related to this issue and also raised in the application for interlocutory appeal is the defendants' contention that Dr. Hull does not provide a causation opinion to support damages and there was no expert testimony to support the wrongful death damages.

Viewing the record of the expert's qualifications in the light most favorable to the non-moving party, we conclude, at this juncture, the expert is qualified to testify regarding the one specification of negligence: whether Dr. Abraham breached the standard of care and was negligent in failing to culture the post-surgery infection to identify the organism that caused the infection, and this failure resulted in ineffective treatment. We agree with the district court that the plaintiff will still be subject to meeting its burden on the expert's qualifications at the time of trial. Furthermore, we conclude the expert's deposition testimony is sufficient to generate a jury question on causation, including the wrongful death damages. We affirm the district court's denial of summary judgment.

**I. Background Facts and Proceedings.**

Viewed in the light most favorable to the plaintiff, the following facts appear in the summary judgment record. Toni Vezeau fractured her ankle on or about

August 1, 2013. Vezeau went to the emergency room at Alegent Health Mercy Hospital ("Mercy") on August 1, 2013, and Dr. Roy Abraham, an orthopedic surgeon, performed open reduction with internal fixation ("ORIF") surgery to repair the fracture on August 2, 2013. At a follow-up appointment on August 20, Dr. Thomas Atteberry removed the dressing, splint, and staples from Vezeau's ankle, and noted, "She is continuing to have some discomfort in the ankle. . . . Incisions appear well healed. No surrounding swelling. Minimal erythema. Easily wiggles her toes. Sensation is within normal limits." Dr. Atteberry also noted x-ray showed "fractures to be appropriately reduced." Dr. Atteberry prescribed Vezeau pain medication and placed her in a padded short-leg cast.

At Vezeau's one-month follow-up appointment, Dr. Abraham removed the padded cast and noted there was "some mild pus coming out" but that "it looks reasonably healed." Dr. Abraham noted Vezeau continued to complain of pain, and he prescribed her more pain medication. Dr. Abraham noted he told Vezeau this would be her final prescription for pain medication.

On September 20, Dr. Abraham saw Vezeau again, and noted:

> Her ankle did have an episode of mild cellulitis. Today it looks better but still slightly swollen and mildly red, but no drainage. She does complain of pain. ROS: No rise of temperature. No neurological deficits. . . . Examination of the ankle shows good dorsiflexion, plantar flexion, about fifteen to twenty degrees. She has mild redness on the lateral side of the incision. . . . X-rays taken today shows that the ankle has been maintained in excellent position. . . . I am going to arrange for her to start some physical therapy to get her ankle moving. She can weight bear as tolerated. I also will arrange for her to be seen by a pain doctor to manage her pain.

Vezeau met with Dr. Huy Trinh on September 27. Dr. Trinh noted:

> She has been treated for infection with Keflex and Augmentin for almost four weeks with no improvement. She continues to have

a lot of pain right ankle. . . . She does full weight bearing. She does not run any fever or chills. . . . On exam there is moderate redness around the lower part of lateral incision. There is minimal drainage. There is moderate swelling of the ankle still. . . . We repeated x-ray right ankle today in the office and shows the fracture of the distal fibula is healing in excellent position. I do not see any lysis.

Under "Impression," Dr. Trinh wrote, "Deep infection post ORIF of bimalleolar fracture right ankle." Dr. Trinh recommended Vezeau undergo a procedure to drain and possible remove hardware from her right distal fibula. Dr. Trinh further noted,

The patient, due to personal conflict does not want to see Dr. Abraham. With Dr. Atteberry on call I will ask him to perform the surgery tomorrow at Mercy. She will need IV antibiotics. . . . Will put her on Vancomycin to start with after the culture has been done in the OR.

On September 28, Dr. Atteberry performed the surgery to irrigate and debride Vezeau's wound and to remove a plate and screws from her ankle. Two screws were left in place. On September 30, cultures of the wound indicated a possible MRSA infection. After MRSA was detected, doctors began aggressively treating Vezeau's infection with antibiotics. Vezeau returned for a re-check with Dr. Atteberry on October 29. Dr. Atteberry noted at that time:

She feels the ankle is steadily improving. She is able to walk more easily with less pain. Patient is complaining of her left shoulder. Apparently, she thinks she injured that in the original accident. She states she has also fallen twice since the time of the accident, landing on the shoulder. She notes fairly constant pain in the shoulder. She has difficulty using crutches. . . . ROS: Significant for decreased right ankle pain and swelling. No fevers or chills. . . . Patient's right ankle looks much improved. Incision is well healed. No drainage. No surrounding swelling or erythema. She is able to actively flex and extend the ankle.

On December 27, Vezeau saw infectious disease physician Dr. Joong Yong Kwon. Dr. Kwon noted Vezeau,

Had initial septic arthritis in 10/2013, at that time two screws on the medial side remained. s/p 7 weeks Dapto, then had recurrence on the medial side and had I&D and HWR done on 11/22/13. Culture grew MRSA again, vanco MIC 2.0 then has been on IV daptomycin and plan to continue through 1/2/2014.

Vezeau re-injured her ankle while getting out of bed and visited the emergency room at Mercy on February 25, 2014. Vezeau was admitted to the hospital, and Dr. Abraham consulted. Dr. Abraham noted:

MRI according to the report shows signs of osteomyelitis. . . . No redness, minimal swelling over the right ankle, no evidence of acute infection. . . . The ankle itself surprisingly does not look actively infected. There is minimal swelling, no redness or high temperature. No evidence of any discharge. All the incisions looked healed. Good range of movements of the ankle. The MRI suggests possible lesions in the talus and the tibia. . . . I will put her on some IV antibiotics to see if this will settle however to deal with the lesion of the talus of this nature would need some more expert help which our group does not have. . . . I did aspirate the right ankle and did not get any pus. I have sent it for some culture and sensitivity. We will wait to see if this grows anything and if it does we will put to the appropriate antibiotic.

Despite aggressive, repeated treatment with antibiotics, Vezeau developed chronic septic arthritis with possible osteomyelitis. At that point, as stated by a defense expert, "One of the only remaining options was amputation." On April 29, 2014, Vezeau underwent a right below-knee amputation.

Approximately eight and half months later, on January 13, 2015, Vezeau was hospitalized for psychiatric issues including suicidal thoughts, chronic alcoholism, alcohol intoxication, mood problems, and phantom limb pain. Vezeau had a history of depression and substance abuse. She told doctors she was suicidal because of her leg amputation. She told one doctor, "I can't live like this anymore" while pointing at her knee. Vezeau was discharged from psychiatric

care on January 28, 2015. On February 6, 2015, Vezeau died of an accidental mixed-drug overdose.

On July 29, 2015, Kassie Rene Vezeau-Crouch, individually, as daughter and administrator of the estate of Toni Annette Vezeau, sued Dr. Abraham and Miller Orthopedic.[1] The plaintiff alleged professional negligence in the following ways, found in paragraph 21 of the petition:

> (1) Failing to properly perform the surgery to the ankle on August 2, 2013;
> (2) Failing to properly monitor or supervise the surgery to the ankle on August 2, 2013;
> (3) Failing to properly follow industry sterilization and safety standards;
> (4) Failing to properly undertake steps to avoid the spread of a MRSA infection; and
> (5) Other unspecified acts of negligence.

This interlocutory appeal only relates to paragraph (4).

The plaintiff designated Dr. Hull as the sole, retained medical expert witness to testify regarding standard of care, proximate cause, and damages. Dr. Hull is an epidemiologist with more than forty years of experience in infectious disease control. He trained as an epidemic intelligence service officer with the Centers for Disease Control and has been employed with the Minnesota Department of Health in the infectious disease epidemiology prevention and control division. Dr. Hull testified that during his time with the Minnesota Department of Health, the department became "the first health department in the country to make MRSA

---

[1] Crouch also sued Alegent Health Systems d/b/a CHI Health and d/b/a Mercy Hospital, Jiant Properties LLC, and Anthony and Jill Misciskia. This appeal pertains only to the motion for summary judgment filed by Dr. Abraham and Miller Orthopedic.

reportable, and we had an extensive surveillance system and were national leaders in studying MRSA."

Dr. Abraham and Miller Orthopedic filed a motion for summary judgment, contending Dr. Hull was not qualified "to testify as to issues of standard of care, breach and causation for an orthopedic surgeon's operative and post-operative care and treatment of an orthopedic surgical patient." Defendants also contended they were entitled to summary judgment on causation and damages. The plaintiff resisted the motion, contending Dr. Hull was qualified to offer the standard of care opinion he offered—that the standard of care would have been to culture the wound to identify the organism and treat the infection with the appropriate antibiotics.

The district court rejected the Defendants argument Dr. Hull was not a qualified medical expert and denied the motion for summary judgment, stating,

> The plaintiff[] assert[s] that the issue in this case is the infectious disease and not the surgery itself and, therefore, Dr. Hull is qualified as an epidemiologist. When reviewing the issue in the light most favorable to the plaintiffs, the court finds at this time that Dr. Hull is qualified to testify in this case but will still be subject to meeting the plaintiff['s] burden at time of trial.

The court also found Dr. Hull testified about a breach of the standard of care during his deposition, and that deposition testimony effectively revised his expert report. The court found the Defendants had ample time to address the revision and denied summary judgment on causation grounds. Lastly, on the matter of wrongful death damages, the court acknowledged there was no expert testimony that Vezeau's leg amputation was the cause of her eventual drug overdose, but noted Dr. Hull did testify that "early detection and treatment would have greatly increased the

chances" to avoid amputation. Further, Vezeau herself informed hospital staff that she was suicidal because of her leg amputation and she was placed on several medications to alleviate her mental health symptoms, pain, and phantom limb pain. The court concluded summary judgment should be denied, citing *Mulhern v. Catholic Health Initiatives*, 799 N.W.2d 104 (2011) (explaining the question of negligence of a non-custodial suicide is commonly a question of fact).

On July 31, 2017, Defendants filed an application for interlocutory appeal, contending the district court erred in not disqualifying Dr. Hull from providing the standard of care opinion he provided and in denying summary judgment. Defendants also contend the district court erred in not granting summary judgment on the issues of causation and wrongful death damages. The application for interlocutory review was granted on October 6, 2017.

## II. Scope and Standard of Review.

We review summary judgment rulings for correction of errors at law. *Baker v. City of Iowa City*, 867 N.W.2d 44, 51 (Iowa 2015). In a case such as this, summary judgment is appropriate "when the party can demonstrate that the proof of the other party is deficient as to a material element of that party's case." *Thompson v. Embassy Rehab. & Care Ctr.*, 604 N.W.2d 643, 646 (Iowa 2000); *see also Welte v. Bello*, 482 N.W.2d 437, 440 (Iowa 1992) (stating summary judgment is appropriate if expert testimony is required to establish general negligence or foundational facts and such testimony is unavailable); *Oswald v. LeGrand*, 453 N.W.2d 634, 635 (Iowa 1990) (citing *Donovan v. State*, 445 N.W.2d 763, 766 (Iowa 1989) (stating issue is "not whether there was *negligence* in the actions of the defendant but whether there was *evidence* upon which liability could

be found")).  The court reviews the record in a light most favorable to the opposing party.  *Frontier Leasing Corp. v. Links Eng'g, L.L.C.*, 781 N.W.2d 772, 775 (Iowa 2010).  We afford the opposing party every legitimate inference the record will bear.  *Id.*

## III. Discussion.

### A. Necessity of Expert Testimony in Medical Negligence Suits.

To establish a prima facie case of medical negligence, the plaintiff must submit evidence that shows: (1) the applicable standard of care, (2) a breach of the standard of care, and (3) a causal relationship between the breach and the harm the plaintiff allegedly experienced.  *See Peppmeier v. Murphy*, 708 N.W.2d 57, 61–62 (Iowa 2005).  Almost always, a plaintiff must prove each element through expert testimony.  *Phillips v. Covenant Clinic*, 625 N.W.2d 714, 718 (Iowa 2001).

If the standard of care of a physician, surgeon, or dentist is at issue, Iowa law permits only testimony upon the appropriate standard of care by an expert who has "qualifications relate[d] directly to the medical problem or problems at issue and the type of treatment administered in the case."  Iowa Code § 147.139;[2] *Bray v. Hill*, 517 N.W.2d 223, 226 (Iowa Ct. App. 1994).  A physician need not be a specialist in a particular field of medicine to give an expert opinion.  *See Shover v. Iowa Lutheran Hosp.*, 107 N.W.2d 85, 89 (1961).  An expert witness must be generally qualified in a field of expertise and must also be qualified to answer the

---

[2] The expert witness qualifications required by Iowa Code section 147.139 were amended in 2017.  Here, the parties agree the 2015 version of the statute governs the plaintiff's action.

particular question propounded. *Tappe v. Iowa Methodist Med. Ctr.*, 477 N.W.2d 396, 402 (Iowa 1991).

### B. Investigation and Treatment of MRSA Infection.

The Defendants contend Dr. Hull is not qualified to offer the standard of care opinion he rendered because his medical qualifications and experience do not relate directly to the medical problems and treatment administered in this case. The plaintiff asserts the medical problem in this case is whether the MRSA infection was properly investigated and treated—not the surgery itself[3]—and, therefore, Dr. Hull is qualified to testify based on his training and experience as an epidemiologist specializing in infectious diseases.

Dr. Hull testified in his deposition that Dr. Abraham fell short in his duties to investigate Vezeau's infection and to treat it properly. Specifically, Dr. Hull testified that when Dr. Abraham observed pus coming from the wound on September 6, 2013, Dr. Abraham should have cultured the pus to determine what organism Vezeau was infected with. When Vezeau saw Dr. Abraham on September 20, there was no indication in the medical records that the pus was cultured or that Vezeau was being treated with antibiotics. It wasn't until September 27 that Dr. Trinh noted Vezeau had been treated with the antibiotics Keflex and Augmentin. Dr. Hull testified Keflex and Augmentin are not effective against MRSA.

---

[3] Neither the appellant's motion for summary judgment, nor the ruling on the same, addressed the plaintiff's specific claims found in paragraph 21 of the petition. Nor does there appear to be an amended petition in the record narrowing the plaintiff's claims. The denial of summary judgment on these claims was not raised on appeal, and we do not address them.

Dr. Hull testified a wound culture would have enabled Dr. Abraham to determine if Vezeau had MRSA and then treat her with the correct antibiotics. Dr. Hull also testified if Vezeau had been treated with antibiotics effective against MRSA, "it would have substantially reduced the chances that she would have progressed to the point where her leg needed to be amputated." Dr. Hull testified that based on the site of the infection, the fact the infection developed shortly after surgery, and that MRSA is a common cause of post-surgical infections, it was more likely than not a post-surgical infection resulted from contamination of the wound at the time of surgery.[4]

Many of the Defendants' complaints regarding Dr. Hull's qualifications mirror the new requirements of Iowa Code section 147.139 (2018).[5] As previously

---

[4] Dr. Hull also testified he was not able to identify exactly how the contamination occurred.

[5] The new statute requires:

> If the standard of care given by a health care provider, as defined in section 147.136A, is at issue, the court shall only allow a person the plaintiff designates as an expert witness to qualify as an expert witness and to testify on the issue of the appropriate standard of care or breach of the standard of care if all of the following are established by the evidence:
>
> (1) The person is licensed to practice in the same or a substantially similar field as the defendant, is in good standing in each state of licensure, and in the five years preceding the act or omission alleged to be negligent, has not had a license in any state revoked or suspended.
>
> (2) In the five years preceding the act or omission alleged to be negligent, the person actively practiced in the same or a substantially similar field as the defendant or was a qualified instructor at an accredited university in the same field as the defendant.
>
> (3) If the defendant is board-certified in a specialty, the person is certified in the same or a substantially similar specialty by a board recognized by the American board of medical specialties, the American osteopathic association, or the council on podiatric medical education.
>
> (4) (a) If the defendant is a licensed physician or osteopathic physician under chapter 148, the person is a physician or osteopathic physician licensed in this state or another state.
>
> (b) If the defendant is a licensed podiatric physician under chapter 149, the person is a physician, osteopathic physician, or a podiatric physician licensed in this state or another state.

noted, the parties agree the 2015 version of the statute governs this action. The 2015 version of the statute requires only that the expert's "qualifications relate directly to the medical problem or problems at issue and the type of treatment administered in the case." Essentially, the Defendants contend that because Dr. Hull is not an orthopedic surgeon, does not actively treat patients, and has never diagnosed or treated a patient infected with MRSA, he cannot offer an expert opinion as to whether the MRSA infection was properly detected and treated.

Some of the arguments raised by the Defendants might be relevant to the weight of Dr. Hull's testimony, but none of the issues raised disqualify Dr. Hull under the governing section 147.139 from testifying as to whether Dr. Abraham breached the standard of care and was negligent in failing to culture the post-surgery infection to identify the organism with which Vezeau was infected.

Granting of summary judgment has been upheld in cases in which the plaintiff failed to timely designate an expert. *See, e.g.*, *Donovan*, 445 N.W.2d at 765. In one case, summary judgment was granted and upheld on appeal where the plaintiff's designated expert refused to opine on the appropriate standard of care or its breach. *See Kush v. Sullivan*, No. 12-1292, 2013 WL 4437077, at *2–3 (Iowa Ct. App. June 12, 2013). Summary judgment has also been deemed appropriate where the only designated expert was unable to conclude whether there was a breach of the standard of care. *See, e.g.*, *Kennis v. Mercy Hosp. Med. Ctr.*, 491 N.W.2d 161, 164 (Iowa 1992).

Whether an expert is qualified to testify is a question of law for the court to decide. S*ee Ranes v. Adams Labs., Inc.*, 778 N.W.2d 677, 686 (Iowa 2010). But, our supreme court has also said, "[T]he qualifications of an expert can only be

properly assessed in the context of the issues to be determined by the fact finder." *Id.* at 687. So, although the question of whether the expert is qualified is a legal question, that question can only be answered based on what the record discloses about the expert's training and experiences and the medical problems and treatment administered in the case.

Here, we are tasked with deciding whether summary judgment is appropriate based on Dr. Hull's qualifications to testify Dr. Abraham was negligent in investigating and treating the MRSA infection. Viewing the record of Dr. Hull's qualifications in the light most favorable to the plaintiff, the district court concluded summary judgment should be denied. In its ruling, the court noted the plaintiff would still carry the burden at trial of showing Dr. Hull is qualified to offer expert testimony. We discern no legal error in the district court's ruling.

**C. Causation**

The Defendants also contend they are entitled to summary judgment because Dr. Hull was "unable to opine that the alleged breach of the standard of care more likely than not caused the damages at issue." The plaintiff contends Dr. Hull adequately stated his opinion that, "I think [if Vezeau had been treated with other antibiotics that would have been effective against MRSA] it would have substantially reduced the chances that she would have progressed to the point where her leg needed to be amputated." Dr. Hull also stated he could not say "for certain" whether amputation would have been prevented had Vezeau been treated earlier with different antibiotics.

Where "common knowledge and everyday experience would not suffice to permit a layman's expression of opinion as to whether" a medical provider's

alleged negligence was "a substantial factor in bringing about the complained of result," then causal connection must be founded upon expert evidence. *See McCleeary v. Wirtz*, 222 N.W.2d 409, 413 (Iowa 1974). Where expert testimony is necessary to establish causation, "[t]he rule is that expert testimony indicating *probability* or *likelihood* of a causal connection is sufficient to generate a question on causation." *Hansen v. Cent. Iowa Hosp. Corp.*, 686 N.W.2d 476, 485 (Iowa 2004). Testimony that a breach of the standard of care increased the risk of harm is sufficient to generate a questions on causation. S*ee Asher v. OB-Gyn Specialists, P.C.*, 846 N.W.2d 492, 503 (Iowa 2014), *overruled on other grounds by Alcala v. Marriott Int'l, Inc.*, 880 N.W.2d 699, 708 n.3 (Iowa 2016). Absolute certainty is not required, and the evidence of causation does not need to be conclusive. *See Ranes*, 778 N.W.2d at 688. "Buzzwords like 'reasonable degree of medical certainty' are therefore not necessary to generate a jury question on causation." *Hansen*, 686 N.W.2d at 485.

Dr. Hull testified treating Vezeau earlier with different antibiotics would have "substantially reduced the chances" the leg would need to be amputated. We conclude this testimony is sufficient to generate a question on causation, and the district court did not err in denying summary judgment on causation.

**D. Wrongful Death Damages.**

Finally, Defendants contend the district court erred in denying summary judgment on wrongful death damages because Dr. Hull did not offer any opinion that the breach of the standard of care caused Vezeau's death by accidental drug overdose. "Generally, questions of negligence and proximate cause are for the

jury; it is only in exceptional cases that they may be decided as matters of law." *Barnes v. Bovenmyer*, 122 N.W.2d 312, 314 (Iowa 1963).

This is not the sort of case where common knowledge and everyday experience would not suffice to permit a layman to opine whether the claimed negligence was a substantial factor in bringing about the complained of result. *See McCleeary*, 222 N.W.2d at 413. The plaintiff claims a chain of events beginning with the Defendants' breach of the standard of care led to Vezeau's wrongful death. The Defendants claim the Vezeau's significant, pre-existing substance abuse, mental health, and psychiatric diagnoses are to blame for her accidental overdose.

Prior to her amputation, Vezeau had a history of depression and drug and alcohol abuse, but her medical records disclose she regularly denied having suicidal thoughts. Vezeau complained of ankle pain shortly after the first surgery and was prescribed pain medication by Dr. Abraham. At her one-month follow-up appointment, the appointment at which Dr. Abraham noticed pus coming from the wound, Vezeau continued to complain of pain and was prescribed more pain medication. After her leg was amputated due to the continuing MRSA infection, Vezeau suffered additional pain, including phantom limb syndrome, and negative perceptions of her body, and she was prescribed more pain medication. Vezeau went to the emergency room because she was having suicidal thoughts and told doctors her suicidal thoughts were because of her amputated leg and phantom pain. Vezeau told doctors she was consuming large quantities of alcohol on a daily basis. At the time she was hospitalized for suicidal thoughts, Vezeau apparently had prescriptions for methadone, oxycodone, pregabalin (for nerve pain),

sertraline (antidepressant), and quetiapine (antidepressant). She was then hospitalized at a psychiatric hospital. It is not clear from the record what prescriptions Vezeau was taking when she was discharged from the psychiatric hospital. Nine days after Vezeau was discharged from the psychiatric hospital, she died of an accidental mixed-drug overdose. Whether Vezeau's death by accidental mixed-drug overdose was caused by the chain of events beginning with alleged negligence leading to a MRSA infection and amputation and the resulting pain is a disputed material fact. Summary judgment was properly denied.

**AFFIRMED.**